United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 9, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-10894

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

DUNYELL LASALLE WRIGHT,

                                        Defendant-Appellant.

--------------------
Appeal from the United States District Court
for the Northern District of Texas
--------------------

Before HIGGINBOTHAM, DAVIS, and WIENER, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Defendant Dunyell Wright plead guilty to wire fraud stemming from a scheme which defrauded mortgage lenders. He challenges the district court's enhancements to his sentence for obstruction of justice, abuse of position of trust, and use of sophisticated means, as well as its finding of relevant conduct and order of restitution. We vacate the sentence and remand for resentencing.

I

Defendant Dunyell Wright founded MFG Financial Services, a mortgage brokerage, in Arlington, Texas in November of 2001. From December 10, 2002 through January, 2003, Wright worked with David Hale to fraudulently secure a mortgage in Hale's name, the

purchased house to be used by Hale and his partner K&B One Stop Real Estate Services as part of a business venture. As part of the scheme, Wright misstated Hale's creditworthiness on applications to WMC Mortgage Corporation, the eventual lender, secretly used his own funds to pay the closing costs, and used a cashier's check from his account to pay the down payment, then submitted a copy of the check to WMC that had Hale's name on it to imply that Hale had paid the down payment. All of this, of course, was to ensure that Hale was approved with a good rate, increasing Wright's commission, and possibly garnering him a side payment. Chase Home Finance eventually purchased the mortgage from WMC and lost $104,000 on it.

As part of another scheme, Damon Tippie sought to purchase a house, which K&B would then turn into an assisted living center, after which K&B would pay Tippie a salary and pay Tippie's mortgage for six months. Tippie, who knew he didn't have the means to get the required $750,000 mortgage, was told by K&B to work with Wright. Wright again performed his sleight of hand. Chase Home Finance eventually purchased this mortgage as well, suffering a $149,727 loss.

Following Wright's indictment, FBI Special Agent Frank Super found Wright at an apartment in Grand Prarie, Texas. After knocking on the door, Wright appeared and initially denied his identity. After Wright admitted his identity, Super advised him of the warrant for his arrest. While standing in front of the door, Super told Wright to get dressed because he was going to be

arrested and transported to jail in Forth Worth. Wright briefly argued with Super, then abruptly closed and locked the door. Super called local police, who arrived fifteen minutes later and knocked on the door. They suspected Wright was inside because they heard noises and saw the blinds move. Sometime later, the police forcefully entered the house and determined that Wright had earlier fled out the back door. Wright remained a fugitive until his capture in Irving, Texas six weeks later.

The Government charged Wright with three counts of bank fraud, one count of false use of a Social Security Number, and one count of wire fraud. Wright eventually plead guilty to the last count without a plea agreement. The PSR concluded that the loss amount was $270,446, representing the two losses to Chase Home Finance and about $16,755 of losses to other banks alleged in counts one through four. It then added two levels for obstruction of justice based on Wright's flight, two levels for abuse of trust, and two levels for use of sophisticated means. After deducting three levels for acceptance of responsibility, the range was 70 to 87 months.

Wright objected to all three enhancements and the inclusion of the Tippie loss and the $16,755 in the loss amount. Regarding the obstruction of justice enhancement, Wright argued that "the Application notes for U.S.S.G. § 3C1.1 specifically exclude 'avoiding or fleeing from arrest' as grounds for an enhancement for obstruction of justice." In its response, the Government agreed

3

that the obstruction of justice enhancement should not apply but defended the other two. It conceded that the $16,755 should not be included in the loss amount, but it defended inclusion of the Tippie loss. The amended PSR reaffirmed all three enhancements and inclusion of the Tippie loss.

At sentencing, the parties discussed the enhancements and the loss amount with the court. The district court applied all three enhancements and found the loss to include the Tippie loss, but apparently not the $16,755 - it never mentioned that number. After sustaining Wright's objection to the calculation of his criminal history points, the final range was 46 to 57 months. The court gave Wright 57 months and ordered him to pay $270,466 in restitution, a figure which includes the $16,755. Pursuant to the Government's motion, the court dismissed the first four counts.

Wright appeals application of the three enhancements, the inclusion of the Tippie loss in calculating the offense level, and the inclusion of the Tippie and $16,755 losses in the order of restitution. We address each in turn.

II

U.S.S.G. § 3C1.1 provides a two-level increase for obstruction of justice. Application Note five lists conduct for which the increase doesn't apply, and 5(d) is "avoiding or fleeing from arrest." Note 4 lists conduct for which the increase does apply, and 4(c) is "escaping or attempting to escape from custody."

4

As an initial matter, Wright argues that we review *de novo* the applicability of this enhancement to the undisputed facts of this case.[1] The Government urges plain error because, as we explain later, the parties and the court used the wrong standard in analyzing the issue. Thus, the Government asserts, Wright's "theory" on appeal is different from that advanced below. While it is true that a defendant can't argue a new "theory" on appeal,[2] Wright is not presenting a new theory here - he objected to the enhancement, citing the exact note to the Guideline provision that controls the issue, he just didn't cite this court's controlling precedent interpreting that note. The cases cited by the Government all involve more than just lack of citation to the proper cases. And, of course, it was up to the district court to apply the proper law. Wright preserved the issue, which we review *de novo*.

The PSR stated that the enhancement applied because Wright fled in a "deliberate" rather than "spontaneous" manner. In response to Wright's objection, the amended PSR urged again that Wright's flight was deliberate. At sentencing, Wright's counsel disputed the enhancement, stating: "[T]he probation officer says the flight [was] other than spontaneous, but actually, the facts show just the opposite. They show a spontaneous flight. They don't show any kind of deliberation." The court and counsel then

---

[1] *See United States v. Chavarria*, 377 F.3d 475, 478 (5th Cir. 2004).

[2] *See United States v. Green*, 324 F.3d 375, 381 (5th Cir. 2003).

5

discussed whether Wright's flight was spontaneous or deliberate. The district court ultimately ruled:

> I'm going to hold on to my position there. If he just fled and had been caught promptly, I think I would not tip over the line, but when he's been told he's about to be arrested, closes the door, and he goes out the back, and then he's out for six more weeks, they can't find him, he doesn't report, he knows at that point that he is – has an arrest warrant outstanding for him and still stays out, I think that's obstruction.

In *United States v. Huerta*,[3] this Court adopted the reasoning of the Fourth Circuit in *United States v. Williams*[4] and Sixth Circuit in *United States v. McDonald*[5] that the critical, simple inquiry under 5(d) and 4(e) is whether the defendant escaped from custody or was avoiding custody, regardless of his state of arrest. In *Williams*, the defendant escaped soon after being placed in the back of a police car. On appeal, Williams argued that although he had technically been arrested when he fled, he was not "truly in custody" at that time because he escaped during the "arrest episode," noting that most § 3C1.1 enhancements were levied for escape long after arrest, after the defendants were clearly in "custody." The court rejected this reach for a "gray area" between 5(d) and 4(e) because "custody" and "arrest" are "well-settled" as separate legal concepts, hence a defendant who escapes from "custody," even if he does so during the "arrest episode," has

---

[3] 182 F.3d 361 (5th Cir. 1999).

[4] 152 F.3d 294, 304 (4th Cir. 1998).

[5] 165 F.3d 1032, 1035 (6th Cir. 1999).

obstructed justice. In other words, the court reconciled 5(d) and 4(e) by holding that "custody" is the key question - once a defendant is in "custody," he is no longer "avoiding or fleeing from arrest" if he escapes. This court in *Huerta* explicitly rejected the reasoning of the Second and Seventh Circuits, which focused on whether the defendant's conduct was deliberate or spontaneous.[6] Consequently, the parties and the court below used the wrong standard, as the parties recognize on appeal. We ask only whether Wright was in custody when he fled.[7]

This court recently defined "custody" under § 3C1.1 as the *Miranda* standard of "custody." In *United States v. Brown*, deputies responded to a domestic violence call.[8] They picked up the victim and drove her to her boyfriend's trailer. On the way, they learned the boyfriend's name and discovered he had a warrant for his arrest. After arriving at the trailer, they informed Brown of the warrant and one deputy grabbed him, but he broke free and ran away, remaining on the lam for about eight months before he was finally captured. The court, quoting a Supreme Court case defining "custody" for *Miranda* purposes, framed the question as whether there was "a formal arrest or restraint on freedom of movement of

---

[6] *See United States v. Draves*, 103 F.3d 1328 (7th Cir. 1998); *United States v. Stroud*, 893 F.3d 504 (2d Cir. 1990).

[7] We note that "avoiding or fleeing from arrest" under Application Note 5(d) must mean "avoiding arrest," not "avoiding arrest or escaping after being arrested," otherwise Application Note 4(c) makes no sense. In any event, our only inquiry is what constitutes "custody."

[8] 470 F.3d 1091 (5th Cir. 2006).

the degree associated with formal arrest."[9]  The court then held that Brown was never in such "custody" because he broke free and escaped and the deputies never exercised "a degree of formal control or restraint over him."  Unable to distinguish our case from *Brown*,[10] we must conclude that Wright was not in "custody" when he fled.  Indeed, here Agent Super never had physical contact with Wright before Wright ran.  We must vacate the sentence and remand, although we address the remaining issues for reasons of economy.[11]

### III

U.S.S.G. § 3B1.3 provides a two-level increase for abuse of position of trust.  "The district court's application of section 3B1.3 is a sophisticated factual determination that we review for clear error."[12]

---

[9] *Id.* at 1095 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

[10] The court in *Brown* also held that § 3C1.1 did not apply because Brown's flight did not occur "during the course of the investigation, prosecution, or sentencing of the instant offense of conviction," as § 3C1.1 requires, because the deputies found the gun which led to the federal conviction under § 922(g) in Brown's trailer *after* Brown escaped.  That holding is inapplicable here because Wright escaped during the investigation for fraud.  The Government argues that *Brown*'s "custody" holding was, therefore, dicta.  But it's well-settled that alternative holdings are binding, they are not dicta.  The Government also suggests that statements in *Brown* after the court's "custody" holding permit a different result here, but those statements – discussion of policy and some particulars of Brown's case – were only in "further support" of the court's holding.  *Brown*'s custody holding is clear.

[11] *See United States v. Farfan-Carreon*, 935 F.2d 678,679 (5th Cir. 1991) (electing to address legal issues, even after concluding that remand was appropriate for another reason, as a guide to the court on remand).

[12] *See United States v. Bur*ke, 431 F.3d 883, 889 (th5 Cir. 2005).

8

Section 3B1.3 provides a two-level increase if "a defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense...." Application note 1 provides:

> 'Public or private trust' refers to a public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense.

In *United States v. Jobe*, this court interpreted that note to mean that 3B1.3

> encompasses two factors: (1) whether the defendant occupies a position of trust and (2) whether the defendant abused her position in a manner that significantly facilitated the commission of concealment of the offense. To determine whether the position of trust 'significantly facilitated' the commission of the offense, the court must decide whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of her job.[13]

Recommending enhancement here, the PSR stated:

> The defendant abused his trust as the owner and operator of MFG Financial Services, a mortgage brokerage business, to facilitate the offense and his scheme and artifice to defraud. As a mortgage broker, WMC Mortgage Corporation and Ameriquest Mortgage entrusted the defendant to truthfully and accurately submit financial information about the loan applicants. Instead, the defendant entered false information on loan applications with the intent of deceiving the lenders into approving loans.

---

[13] *See* 101 F.3d 1046, 1065 (5th Cir. 1996).

9

Responding to Wright's objection, the amended PSR stated:

> [Wright's] position of trust was characterized by the faith given to him by financial institutions to present truthful and accurate information to make their credit-based decisions. His ability to function as an independent broker further illustrates [his] position of trust since he could only operate with a license.

At sentencing, the court heard Agent Super's testimony that "brokers are expected to do some diligence when putting a loan together. In essence, when that package goes to the mortgage company, they expect that most of that stuff that's on there, the employment, income, and other information, has pretty much been proven by the broker." The district court applied the enhancement.

Wright argues first that, while no cases are directly on point, he did not occupy a position of trust with WMC because he didn't work for that company and because borrower-lender relationships, and by extension broker-lender relationships, are arms-length. He cites *Jobe*, where the defendant was a director of the bank which he defrauded through a check-kiting scheme, as the classic position of trust case. He also cites the Second Circuit's decision in *United States v. Jolly*, where the court, in striking down the enhancement where the defendant fraudulently raised money from investors by providing them false information, stated that borrower-lender relationships are generally arms-length and solely contractual.[14] Second, he argues, even if he occupied a position of trust, that position did not "significantly facilitate[] the

---

[14] *See* 102 F.3d 46, 48 (2d Cir. 1996).

10

commission of concealment of the offense" because he simply forwarded the loan applications to WMC, and the application could have been submitted just as easily by the individuals themselves.

The Government focuses on Agent Super's testimony about the trust that lenders give to mortgage brokers, arguing that that trust placed him in a superior position than most people to victimize WMC. It also emphasizes Wright's license, arguing that the license highlights and justifies the presence of such trust. For this proposition it cites *United States v. Gonzalez-Alvarez*,[15] where the First Circuit held that a licensed dairy farmer who intended that contaminated milk reach the public abused a position of trust, partially because of the license.

Although this is a close case, we will not disturb the district court's conclusion that Wright occupied a position of trust that significantly facilitated his fraud. Although there is no legally recognized-relationship of trust between brokers and lenders, such legal recognition is not required, and the undisputed record in this case reveals that lenders often rely to some degree on statements by brokers in evaluating applications. That lenders, who are generally distrusting and like to verify information for themselves, would do so makes more sense given that brokers independently verify all relevant information before submitting applications and that brokers deal repeatedly with the same lenders and multiple lenders, unlike the average borrower. The

---

[15] 277 F.3d 73, 81 (1st Cir. 2001).

relationship here is not lender-borrower, which we agree will seldom be a relationship of trust.  It's lender-middleman, and there is a difference.  We inquire if there is a position of trust against the background reality that, wherever there is fraud the victim relies on the defendant's statements, so there must be more than just reliance based on factors idiosyncratic to the case at hand.  Here there is reliance that flows from the structure of the mortgage industry itself, which sets a patterned process for loan application that over time cultivates trust between brokers and lenders.

In sum, on the facts before it the district court did not clearly err in concluding that Wright abused his position of trust as a mortgage broker.

IV

U.S.S.G. § 2B1.3 provides a two-level increase for use of "sophisticated means" in certain crimes.  We review the district court's determination of this enhancement for abuse of discretion.[16]  Application note 1 provides:

> Sophisticated Means Enhancement - For purposes of [this enhancement], 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution of concealment of the offense.  For example, in a telemarketing scheme, locating the main office of the scheme in just one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate

---

[16] *See United States v. Powell*,124 F.3d 655, 666 (5th Cir. 1997).

12

shells, or offshore financial accounts also ordinarily indicates sophisticated means.

Recommending enhancement here, the PSR stated:

> As part of the scheme to defraud financial institutions, the defendant used his own funds to purchase cashier's checks for closing costs in the names of the loan applicants, made copies of the same checks which were forwarded to the lenders, then deposited the same cashier's checks into his account. The defendant committed these acts with the intent of misrepresenting the applicants' available funds, in order to bolster their creditworthiness, thereby facilitating the approval of their loans.

In objecting to this rendition of the facts, Wright asserted that although he paid for the cashier's checks, he was later reimbursed for them. The amended PSR tried to clarify:

> The defendant did not use his own funds to purchase cashier's checks in the names of the loan applicants to somehow assist them. Instead, he misrepresented the buyers as having proceeds in order to deceive the lenders and acquire financial gain. The manner of sophistication involved his steps of purchasing the cashier's checks in the names of the buyers with his own funds, forwarding copies of the same checks to the lenders as if they were legitimate buyer assets, then returning the original cashier's check/proceeds to the bank. His actions were intricate, complex, and calculated so as to facilitate the commission of the offense without being detected on either end by his bank or the lender.

At sentencing, the court distilled what actually happened after Wright called Agent Super as a witness:

> Q [Wright's counsel]: Okay. What you're saying is, no, he did not take the cashier's check for that particular deal [described in count 5 of the indictment] and deposit it back into the account. That was actually someone wrote him a check to put in that account; is that correct?
>
> A. That's correct. Someone wrote him a personal check or a business check off their business checking account,

13

gave it to Mr. Wright. He deposited it into his account and then purchased a cashier's check.

THE COURT: And what was the purpose of doing that?

THE WITNESS: The purpose is to get a cashier's check for the borrower that is not in Mr. Wright's name but in the borrower's name as if the borrower bought it and then use the cashier's check to pay the borrower's closing costs at the closing.

THE COURT: And what does that achieve?

THE WITNESS: It tells the lender that the borrower has that money when they really don't. That's the act of deception in that count of the indictment.

On cross-examination by the Government, Agent Super further testified as follows:

Q. What happened in Count 5 is what you have been describing; is that correct?

A. Yes.

Q. But was this part of a pattern where the third party would routinely round up borrowers who didn't have the cash for down payments and would, through this type of similar deception, have Mr. Wright falsely represent that the closing funds came from the borrower when, in fact, it came from the third party?

A. That's correct.

Q. This happened over and over again; isn't that right?

A. Yes.

The court overruled Wright's objection, stating:

[T]he scheme was advanced by the fact that funds were made apparent and present for the closing of the deal, which would not have been closed but for the inaccurate impression left that the funds or closing costs came from the borrowers. So that isn't changed by whether the funds came from his account or from a third party's account, and he was the one who was managing that part of the scheme.

14

So whether they came from his funds or someone else's funds, the point is he was involved in a little mini scheme there to mislead the lenders into thinking that the borrowers had enough money to pay closing costs. That's important to lenders because they know that if a person can't even scrape up the money to pay closing costs, they probably are not a very good risk on the loan.

So it seems to me that on the specific offense characteristic, while it's true that it's not extremely sophisticated, the question that I have to answer is [if] it's sufficiently sophisticated that this defendant ought to be punished for it, sufficiently sophisticated beyond the base kind of offense that we ought to add on the two points. I conclude that it is. It's not the most sophisticated plot I have ever seen, but I think it's sufficient to punish him more than the person who didn't do this as part of the scheme.

...

And I agree that it's not rocket science or brain surgery, but I think it does show a level of sophistication sufficient to trigger additional punishment.

Wright argues summarily that his actions weren't sophisticated, pointing to the court's own tepid language. The Government argues briefly to the contrary, noting that the bar is low and citing to *United States v. Clements*,[17] where this court upheld the enhancement against a defendant who took payments under a contract, converted them into cashier's checks, then deposited the checks into a separate account in his wife's name. In so holding, we held that "[e]ven though [the defendant's] transactions did not involve the use of offshore bank accounts or fictional

_____

[17] *See* 73 F.3d 1330, 1340 (5 Cir. 1996).

15

entities, his use of multiple cashier's checks and his wife's separate bank account to obscure the link between the money [and the scheme] made it more difficult for the IRS to detect his evasion." The Government cites this language, arguing that if the simple use of cashier's checks to make discovery of the crime "more difficult" is use of sophisticated means, then use of such checks as part of the scheme, to make it impossible for the lender to discover the fraud, is too.[18]

We find no error in the finding that Wright used sophisticated means. Depositing a check from someone else into your account, and then using that money to purchase a cashier's check in someone else's name, are means as sophisticated as those in *Clements*, at least as part of a scheme to defraud a mortgage broker.

V

The district court included loss from both the scheme of conviction and loss from the Tippie scheme in sentencing Wright. We review that determination for clear error.[19]

U.S.S.G. § 1B1.3(a)(2) provides that a defendant's offense level may be determined on the basis of "all acts and omissions...that were part of the same course of conduct or common

---

[18] We have held that the sophisticated means must relate to the scheme itself, *see United States v. Stokes*, 998 F.2d 279, 282 (5th Cir. 1993) (holding that efforts by defendant to hide embezzled money was related to embezzlement, not tax evasion for which she was convicted), and in reply Wright suggests that his use of the cashier's check wasn't related to the scheme itself. That's ridiculous, of course.

[19] *See United States v. Cockerham*, 919 F.2d 286, 289 ( 5th Cir. 1990).

16

scheme or plan as the offense of conviction...." "Only after the government has met its burden of establishing, by a preponderance of the evidence, 'a sufficient nexus between the [extraneous] conduct and the offense of conviction,' may the sentencing court, in its sound discretion, make a 'relevant conduct' adjustment."[20]

Count five of the indictment alleged that the fraud of conviction occurred from December 10, 2002 to January 17, 2003. Wright argues that because the Tippie loan didn't "generate" – that is, it wasn't funded by WMC – until January 30, 2003, it wasn't relevant conduct. Relatedly, he urges, nothing else in the indictment or the stipulation of facts mentioned the Tippie loan. Moreover, he continues, the scheme was entirely separate – as evidenced by the Government's own reference to the schemes as "different" schemes. In sum, he argues, although the schemes were similar, they weren't part of the same "course of conduct" or a "common scheme or plan."

The Government cites *United States v. Anderson*,[21] which held that:

> It is not necessary for the defendant to have been charged with or convicted of carrying out the other acts before they can be considered relevant conduct. However, for the acts to constitute relevant conduct, the conduct must be criminal. Two or more offenses form part of a common scheme or plan where they are substantially connected to each other by at least one common factor, such as common victims, common accomplices, common

---

[20] *See United States v. Bennett*, 37 F.3d 687, 692 n.8 (1st Cir. 1994).

[21] *See* 174 F.3d 515, 526 (5th Cir. 1999).

17

purpose, or similar *modus operandi*. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Relevant factors in making this determination include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between offenses.

The Government then points to Agent Super's testimony at sentencing, where he stated that the Tippie scheme was "practically identical" to the scheme of conviction, other than the identity of the borrowers. Super further explained that "[b]oth Tippie and Hale, their loan packages, when the applications, the requests, were sent to WMC Mortgage, [were] both December of 2002. Now, it just so happens that Mr. Hale's loan I believe closed on January 17 of 2003, and Mr. Tippie's loan closed, I believe on January [30] of 2003." Thus, the Government asserts, the two schemes were part of a common scheme or plan because they involved a common victim, a common purpose, and a similar *modus operandi*; moreover, they were part of the same course of conduct because they were similar and near in time. It's irrelevant that the Tippie loan closed a few days after January 17, it continues, citing *Anderson*.

The district court did not clearly err in including loss from the Tippie loan. It is reasonable to conclude under *Anderson* that the Tippie scheme was part of a "common scheme or plan" with the indicted scheme because there was a common purpose, similar *modus operandi*, a common accomplice, and, arguably, a common victim. And

18

it is reasonable to conclude that the Tippie scheme was part of the same "course of conduct" as the indicted scheme given the similarity and temporal proximity of the offenses.

VI

Finally, Wright challenges the award of restitution for the Tippie and $16,755 losses. He argues that we should review the award of restitution for abuse of discretion, contending that his objection to inclusion of the Tippie and $16,755 losses for purposes of the Guidelines range preserved the issue, even though he never objected to the restitution specifically.[22] The Government urges plain error. The standard for "relevant conduct" under the Guidelines is more lax than that for determining what conduct can be the basis of restitution, hence the two arguments are distinct and the district court never had the opportunity to address the restitution argument. On the other hand, in this case the arguments are essentially the same, and this court's opinion in *United States v. Cockerham* could be read to hold that an objection to the Guidelines loss calculation preserves a restitution argument.[23] In any event, we need not decide the issue because,

---

[22] *See United States v. Hughey*, 147 F.3d 423, 436 (5th Cir. 1998) (reviewing preserved argument against award of restitution for abuse of discretion).

[23] 919 F.2d 286, 288 & n.1 (5th Cir. 1990). *Cockerham* isn't entirely clear, however. The court stated, "Upon review of the record, we determine that Cockerham's objections were sufficient to require adherence to the [Rule of Criminal Procedure governing restitution] and the VWPA. [fn 1.]" Although that statement does not by itself help, the footnote's parentheticals for two cases are more significant: "(when defendant objects to the factual accuracy of the PSI, [the same Rule of Criminal Procedure regarding restitution] requires the district court to append written findings to the PSI)" and "(loss

19

assuming Wright has preserved the issue, it was not error to award restitution for the Tippie loss, and the Government concedes it was error to award restitution for the $16,755.

Under this court's decision in *United States v. Inman*, "[a] defendant sentenced under the Mandatory Victim Restitution Act ("MVRA") is only responsible for paying restitution for the conduct underlying the offense for which he was convicted."[24] However, "[w]here a fraudulent scheme is an element of the conviction, the court may award restitution for 'actions pursuant to that scheme.'"[25] Yet, under *Inman*, "the restitution for the underlying scheme to defraud is limited to the specific temporal scope of the indictment." Wright argues that the Tippie loan was both unrelated to the scheme of conviction, incorporating his Guidelines argument, and outside the temporal scope of the indictment here.[26] The Government responds that the Tippie loan was related to the scheme of conviction, incorporating its Guidelines argument. And it contends that Wright's reading of "limited to the specific temporal

---

amount in PSI challenged at sentencing hearing necessitates procedural requirements of [same Rule of Criminal Procedure])".

[24] *See* 411 F.3d 591, 595 (5th Cir. 2005).

[25] *See United States v. Cothran*, 302 F.3d 279, 289 (5th Cir. 2002).

[26] In his plea agreement, Wright conceded the court's ability to order "restitution which may be mandatory under the law, and which the defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone...." This language, using the term "relevant conduct," could be read as authorizing restitution more broadly than *Inman*, a questionable propostion. In any event, the Government does not argue that Wright's concession alters the strictures of *Inman*.

scope of the indictment" regarding the Tippie loan is unduly narrow, technical, and unsupported because here almost all parts of the Tippie fraud occurred before January 17 - most notably, the preparation and sending of the loan packets.

We conclude that the Tippie scheme was part of the same scheme as the scheme of conviction for purposes of the MVRA, for the reasons stated in the previous section. Moreover, we conclude that the Tippie scheme fell within the "temporal scope of the indictment." Count five of the indictment alleged that Wright perpetrated the fraud of conviction from December 10, 2002 through January 17, 2003, although it alleged that Wright made the wire transfer prompting the actual wire fraud charge on January 21. The Tippie scheme did not predate the main scheme. And the only part of the Tippie scheme occurring after January 17 was the actual funding of the loan. Everything else - most notably, the planning and the preparation and sending of the applications - occurred before that date. In short, the two schemes occurred simultaneously. *Inman* is easily distinguishable because there the transactions for which restitution was ordered "were not alleged in the indictment and occurred over two years before the specified temporal scope of the indictment."

The Government concedes that the $16,755 order of restitution was error because it was for losses unconnected to the scheme of conviction. The district court on remand should remove that amount from the order of restitution.

21

SENTENCE VACATED AND CASE REMANDED.