FILED
United States Court of Appeals
Tenth Circuit

December 8, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DOLORES MAE ARREOLA,

Defendant - Appellant.

No. 07-2168

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR-06-2495-WJ)**

Michael A. Keefe, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant - Appellant.

David N. Williams, Assistant United States Attorney (Larry Gómez, United States Attorney and Fred J. Federici, Assistant United States Attorney, on the brief), Office of the United States Attorney, Albuquerque, New Mexico, for Plaintiff - Appellee.

Before **KELLY**, **ANDERSON**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

# I. INTRODUCTION

Until she was fired in 2005, Dolores Arreola worked at the Los Alamos National Laboratory ("LANL"). She was responsible for purchasing goods and services needed by LANL personnel to carry out their duties. Arreola had the authority to expend up to $100,000 in LANL funds without any supervisory approval and was authorized to request that LANL issue checks to pay for those purchases. LANL fired Arreola when it discovered she had embezzled $55,489.64 through a scheme of submitting false claims for payments from a fictitious vendor. Facing a multi-count federal indictment, Arreola pleaded guilty to one count of making a false statement, in violation of 18 U.S.C. § 1001(a)(2); one count of presenting a false claim, in violation of 18 U.S.C. § 287; and one count of embezzlement of public funds, in violation of 18 U.S.C. § 641. At sentencing, the district court increased Arreola's offense level by two levels, concluding her abuse of a position of trust facilitated the commission of her crimes. U.S.S.G. § 3B1.3. On appeal, Arreola asserts the district court erred in concluding she occupied a position of trust and, thus, erred in increasing her offense level pursuant to § 3B1.3. Exercising jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, this court **affirms** the sentence imposed by the district court.

## II. BACKGROUND

*A. Factual Background*[1]

LANL's mission is to develop science and technology to help ensure the United States's national security. A substantial amount of the work undertaken at LANL is classified. The United States owns LANL's grounds, facilities, property, and equipment; the United States Department of Energy is responsible for oversight of LANL. All purchases of equipment and expenditures for operations are paid for by the United States.

Arreola began working at LANL in 1979; she continued working there until her criminal activities were discovered in 2005. At the time she committed her crimes, Arreola was working as a Buyer 2 within LANL's Supply Chain Management Division, Procurement Organization ("Procurement Department"). To meet its ongoing needs, LANL purchased property, equipment, supplies, materials, and services from various approved vendors. To obtain needed goods

---

[1]The facts in this case are drawn, almost exclusively, from two sources. The first is the "Admission of Facts" set out in Arreola's plea agreement. The second is the testimony of Warren Finch, the deputy subcontracts manager in the procurement section at LANL. Finch's testimony was developed in a somewhat unusual manner. Prior to the sentencing hearing, the government submitted Finch's affidavit in support of its argument in favor of the abuse-of-a-position-of-trust enhancement. At the sentencing hearing, the district court admitted Finch's Affidavit, treating it as if it were Finch's direct testimony. The court then gave both the prosecutor and defense counsel the opportunity to examine Finch. Although she examined Finch at the sentencing hearing, Arreola did not present any witnesses or documentary evidence in support of her contention that she did not occupy a position of trust at LANL.

or services from an outside vendor or supplier, an authorized LANL employee would complete a purchase request describing the items needed and submit it to the Procurement Department. In her position as a Buyer 2, Arreola was responsible for processing a segment of those purchase requests.

Arreola was not a manager or a large-dollar-contract administrator within the Procurement Department. She did, however, have $100,000 "signature authority," within which she had "great discretion." That signature authority meant she was authorized to make purchases for goods and services costing up to $100,000 in a single transaction without supervisory approval. Within her signature authority, she was expected to exercise her "professional judgment" as to a variety of issues, including choosing a vendor and negotiating and resolving the legal terms and conditions of a purchase order. The decisions she made within her signature authority were "entitled to deference within the LANL system" and were sufficient to commit LANL to a contractual obligation.

Acting within her authority, Arreola had a continuing responsibility to conduct a full range of procurement activities until any particular purchase order was closed out. For example, she was responsible for making decisions such as whether LANL was going to solicit quotes verbally for the procurement activity or, instead, whether it would put together a written request for a quotation or proposal and send it out to the supplier community. She also decided whether the procurement would be handled on a single source or competitive basis. It was

within Arreola's discretion to choose the final vendor based upon other market research that resulted in only one supplier being identified as meeting LANL's requirements or a competitive bidding process in which a supplier was chosen based on the selection criteria in the request for quotation. In sum, Arreola was responsible for reviewing proposals for price reasonableness, negotiating the final terms of the purchase order with suppliers, executing the actual transaction, and closing out the purchase order subcontract when the goods or services were received by LANL.

Arreola's crimes stemmed from her approval for payment of three fake purchase orders, which resulted in LANL issuing checks to a fictitious vendor. All three fraudulent purchase orders were issued for amounts that fell within Arreola's signatory authority. She subsequently arranged for LANL personnel to release the checks to her personally. She then deposited the checks into a bank account to which she had access. Thus, as set out more fully below, Arreola committed her crimes in a way that exploited weaknesses in LANL's procurement system and utilized the discretion inherent in her position as a Buyer 2 within the Procurement Department.

One of the first steps Arreola took to embezzle funds was to enter false data into LANL's computerized vendor desk system to make it appear as if an organization known as the Santo Domingo de Cundiyo Heirs' Association

("SDHA")[2] was a legitimate LANL vendor.[3] She then contacted personnel at the vendor desk requesting that SDHA be made an active and authorized vendor in LANL's procurement system database.[4] These actions were necessary steps in Arreola's criminal scheme, as goods or services could not be procured from any particular vendor until that vendor was first made an active vendor within the procurement system.

After having SDHA falsely established as a legitimate vendor, Arreola began creating fictitious purchase orders based upon other legitimate purchase orders for which she was responsible. She did so by changing the vendor name on an established purchase order to that of SDHA. That is, she would use the same description of goods and services from a legitimate purchase order in her

_____

[2]The record reveals that SDHA is a land grant heirs association organized to seek recognition of certain land grant rights in Cundiyo, New Mexico. At the time she arranged for SDHA to appear to be an active and legitimate LANL vendor, Arreola was the President of SDHA. SDHA had a bank account at the Del Norte Credit Union for which Arreola had signatory authority. She used this bank account as the account into which she deposited the three checks she obtained from LANL.

[3]As was true of other buyers and contract administrators in the Procurement Department, setting up new vendors in the procurement system was part of Arreola's normal duties as a Buyer 2.

[4]According to undisputed testimony at the sentencing hearing, activation of a new vendor by the vendor desk was something of a formality. That is, absent unusual circumstances, there would have been no reason for personnel at the vendor desk to ever question a buyer's request to set up a new vendor. Furthermore, at the time of the events in question, once a vendor was activated in the system, there were no checks and balances in place to identify whether the vendor was legitimate.

fraudulent purchase orders so the goods and services being requested would appear legitimate. For example, on May 9, 2005, Arreola processed a legitimate purchase order to acquire high voltage diodes from a company called VMI. That same day, she prepared a fictitious purchase order for the same items and price, but named SDHA as the vendor. Likewise, on May 25, 2005, Arreola processed a legitimate purchase order for 100 milliliters of "Bulk Reaction Solution - 100" from Genprime Inc. On June 7, 2005, she prepared a fraudulent purchase, again listing SDHA as the vendor, based on the genuine Genprime Inc. purchase order.[5]

After awarding SDHA each of the above fictitious purchase orders, Arreola anticipated that no goods or services were ever going to be received by LANL. In accord with standard government practice, LANL generally would not pay a vendor for any goods and services until those goods or services were actually received. Instead, once goods were received, a receipt report would be generated to alert appropriate personnel so a check could be mailed to the vendor. With regard to the fictitious purchase orders she created, however, Arreola exercised her discretionary authority to approve a waiver of the normal receipt report prior to payment of SDHA. Arreola also utilized her discretionary authority to alter the

[5]Not every false purchase order created by Arreola was based on a previously processed legitimate purchase order. On February 22, 2005, the same day she arranged for it to be activated as a legitimate LANL vendor, Arreola prepared and submitted a fictitious purchase order for SDHA to construct and supply the Lab with various fictitious items, including a hexagon tent gamma ray camera house panel, a hexagonal tent protective envelope cutout panel, a hexagonal tent zipper door panel, and a hexagonal tent plain panel.

standard payment method utilized by LANL. Normally, almost all LANL payments to vendors were mailed. Arreola overrode that general practice, however, and arranged for the checks to be picked up personally by herself for delivery to SDHA. She then deposited the checks into SDHA's account at Del Norte Credit Union, an account for which she had signature authority, and then withdrew the funds for her personal use.

## B. Procedural Background

There was no real dispute at sentencing as to how Arreola committed her crimes. Rather, the dispute involved the applicability of the abuse-of-a-position-of-trust enhancement set out in § 3B1.3. For her part, Arreola asserted she was not a manager and did not exercise sufficient professional or managerial discretion in her job duties to implicate § 3B1.3. She essentially denied she had ever "administer[ed]" any funds on behalf of LANL, instead insisting her position merely "involved processing paperwork and in doing so and having worked for LANL for so many years, she was able to discover a means to fraudulently obtain funds." The government responded that Arreola had been entrusted with ample professional discretion which she had then abused in ways that made her crimes significantly more difficult to detect. Essentially, Arreola was authorized "to spend up to a hundred thousand dollars of the taxpayers' money at a time with no supervisory approval . . . [and w]ith no questions asked." Based on her "signature authority alone, her fraudulent purchase orders were honored." According to the

government, "Nobody down the chain questioned them, because [Arreola] had exercised her authority to approve them."

At the conclusion of the sentencing hearing, the district court concluded Arreola occupied a position of trust at LANL and her abuse of that position of trust significantly facilitated the commission and concealment of her offenses. In so doing, the district court focused on three aspects of Arreola's job at LANL: (1) her $100,000 procurement authority and the significant lack of supervision over purchases she made within the confines of that authority; (2) her ability to have new vendors, like SDHA, activated in the LANL procurement system; and (3) her discretion to waive the normal LANL rules regarding the timing and manner of vendor payments to allow for payment to SDHA in advance of delivery of goods and to allow for her to personally pick up payments and deliver them to SDHA.

## III.  DISCUSSION

On appeal, Arreola challenges the procedural reasonableness of her sentence. She asserts the district court erred in concluding she occupied a position of trust at LANL for purposes of § 3B1.3. *See United States v. Hildreth*, 485 F.3d 1120, 1127 (10th Cir. 2007) (holding that to impose a procedurally reasonable sentence, a district court must consider a properly calculated advisory Guidelines range). "Whether a defendant occupied a position of trust under

[§ 3B1.3] is generally a factual matter that we review for clear error." *United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007) (quotation omitted); *see also United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003) ("Typically, the question of whether an employee occupied a position of trust within the meaning of § 3B1.3 is a heavily fact-specific determination to be made by the district court using the guideline and other factors we have recognized."). Nevertheless, this court "review[s] a district court's interpretation of the Guidelines *de novo* to see if the correct standard was applied to the factual findings." *Spear*, 491 F.3d at 1153.

Section 3B1.3 provides for a two-level increase to a defendant's offense level if she "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." A position of public or private trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. . . ."[6] U.S.S.G. § 3B1.3 cmt. n.1.

_____

[6]The commentary to § 3B1.3 provides the following non-exclusive examples of situations to which the Guideline applies:

> This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a

(continued...)

The discretion necessary to qualify for the enhancement exists where the person charged had the authority to make broad case-by-case decisions for the organization. This discretion requires more than engaging in mere ministerial tasks directed by standardized office protocols.

Accordingly, to determine whether a defendant occupies a position of trust, we must undertake a functional analysis of job responsibilities and examine whether those duties were merely ministerial or were, in fact, managerial. Indications of substantial discretionary judgment under the § 3B1.3 enhancement include the authority to engage in case-by-case decision-making, to set policies, and to grant exceptions to governing policies or protocols. These factors are non-exhaustive, and no one factor is dispositive of the analysis.

*Spear*, 491 F.3d at 1155 (citations omitted). Applying these governing legal standards, the district court did not err when it found Arreola occupied a position of trust at LANL. As the record makes clear, Arreola had the authority to engage in case-by-case decision-making with regard to LANL purchases and the power to grant exceptions to LANL's governing policies. *Id.*

The record reveals Arreola had the power to arrange for the activation of new vendors within LANL's procurement system. In her plea agreement, Arreola admitted it was part of her "normal duties to set up new vendors in the

---

[6](...continued)
patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. n.1.

-11-

procurement system."[7]  The authority to activate new vendors was tied closely to Arreola's primary duty of securing goods and services needed by LANL to carry out its mission.  That is, Arreola was authorized to purchase goods and services for LANL costing up to $100,000 without supervisory approval.  In carrying out that duty, Arreola was expected to exercise her professional judgment in identifying vendors, either through a competitive bidding process or by choosing a single-source vendor that, in her professional opinion, best met LANL's needs.  Accordingly, acting within her signature authority, Arreola had great discretion in identifying vendors, including vendors not previously used by LANL, that could best supply goods and services at competitive prices or under advantageous circumstances.

Arreola had continuing responsibility for each of the purchases she initiated within her signature authority.  After identifying a vendor who would supply goods or services to LANL at a reasonable price, she was tasked with negotiating

---

[7]In her brief on appeal, Arreola attempts to imply her duties regarding the activation of new vendors were merely ministerial and that the real power and discretion lay with the staff of the vendor desk who would "activate" new vendors.  The problem with this argument is that it is not supported by a single citation to the record.  Furthermore, as noted above, Arreola admitted in her plea agreement that setting up new vendors in the procurement system was part of her normal duties.  Likewise, Finch testified the activation of a new vendor by the vendor desk was something of a formality.  Finch further testified that it was not a function of the vendor desk to check to determine if a new vendor added to the system was legitimate.  Thus, the record fully supports the conclusion that it was the actions of the vendor desk that were ministerial in nature, while Arreola's authority to set up new vendors was discretionary in nature.

the final terms of the purchase order, executing the actual transaction, and closing out the purchase order once the goods or services were received by LANL. The case-by-case decisions Arreola made within her signature authority were entitled to deference and were sufficient to commit LANL to a contractual obligation.

Arreola likewise had the power to grant exceptions to governing LANL procurement policies. Standard LANL procedures provided that vendors would be paid only upon receipt by LANL of goods or services. The standard practice was for LANL to mail payments to vendors once the accounts payable desk received a report indicating the goods or services had been received. Arreola used her discretionary authority to waive these rules, thereby allowing her to (1) obtain payment on the fraudulent purchase orders she created without the delivery of any goods or services, and (2) conceal her fraudulent activities by ensuring her fraudulent purchase orders would be closed out before it became apparent no goods or services had been provided to LANL.

In his affidavit, Finch testified as follows regarding Arreola's power to override standard LANL procedures:

> Because the goods which [Arreola] had ordered were fictitious . . . , [Arreola] exercised her discretionary authority to approve a waiver of the normal receipt report prior to payment for her fraudulent purchase orders. As part of her advance payment approval, [Arreola] also apparently arranged for the checks not to be mailed, but instead exercised her discretion and authority to arrange to pick the checks up herself from accounts payable. Almost all LANL checks are normally mailed to vendors as payment for goods and services, but because [Arreola] arranged for this method of payment as part of her

authority as a Buyer 2, this arrangement appears not to have been questioned.

Likewise, in her plea agreement, Arreola admitted she "authorized" or "coded" each of her fictitious purchase orders for "advance payment," "waived the requirement for receiving a report prior to payment, and requested Accounts Payable to notify me when the check[s were] ready so that I could personally pick [them] up." Despite Arreola's protestations to the contrary, her admissions, coupled with Finch's testimony, demonstrate she had the power to override governing standards in the Procurement Department.

The evidence in the record makes clear that Arreola held a position of trust at LANL. A Buyer 2, like Arreola, had exceedingly broad discretion in purchasing goods and services within the $100,000 signature authority, including the discretion to identify a single vendor as the most appropriate source for satisfying LANL's needs. Arreola utilized that discretion in committing her crimes by having SDHA activated as a legitimate vendor in the LANL system and then identifying SDHA as the vendor in each of the three purchase orders she falsified. Arreola then effectively concealed her crimes by exercising her authority to waive LANL procedures designed to prevent payments for undelivered goods: she "coded" the fraudulent purchase orders for advance payment, waived the requirement for a report that the goods had been received, and directed employees at the Accounts Payable desk to prepare checks for her to

pick up and hand deliver.[8] *United States v. Chee*, 514 F.3d 1106, 1118 (10th Cir. 2008) ("The primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong." (quotation omitted)). Accordingly, the district court did not err in concluding Arreola occupied a position of trust at LANL and Arreola's sentence is procedurally reasonable.

## IV. CONCLUSION

For those reasons set out above, the sentence imposed by the United States District Court for the District of New Mexico is hereby **AFFIRMED**.

---

[8]Arreola's heavy reliance on this court's decisions in *Spear* and *Edwards* is misplaced. In both of those cases it was absolutely clear that the defendants, although very trusted employees, had no discretionary or professional authority. *United States v. Spear*, 491 F.3d 1150, 1156-57 (10th Cir. 2007); *United States v. Edwards*, 325 F.3d 1184, 1187-88 (10th Cir. 2003). The record in this case, on the contrary, reveals Arreola exercised substantial discretionary authority in LANL's procurement department.