**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

JASON TIMOTHY THRONE,

        Defendant - Appellant.

No. 16-1296
(D.C. No. 1:16-CR-00073-CMA-1)
D. Colo.

### ORDER AND JUDGMENT[*]

Before **HOLMES**, **MURPHY**, and **PHILLIPS**, Circuit Judges[**].

## I. INTRODUCTION

Jason Throne embezzled money from his employer and did not report the income to the IRS. Pursuant to an agreement with the government, Throne pleaded guilty to one count of mail fraud, 18 U.S.C. § 1341, and one count of making a false tax return, 26 U.S.C. § 7206(1). In arriving at an advisory

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**]After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

sentencing range under the Sentencing Guidelines, the district court increased

Throne's offense level on the mail-fraud conviction by two because Throne

"abused a position of . . . private trust . . . in a manner that significantly

facilitated the commission or concealment of the offense." *See* U.S.S.G. § 3B1.3.

Throne asserts the district court erred in applying § 3B1.3 to increase his offense

level, thus rendering his sentence procedurally unreasonable. *See United States v.*

*Hildreth*, 485 F.3d 1120, 1127 (10th Cir. 2007) ("To impose a procedurally

reasonable sentence, a district court must calculate the proper advisory Guidelines

range . . . ." (quotation omitted)). Exercising jurisdiction pursuant to 28 U.S.C. §

1291, this court **affirms**.

## II. BACKGROUND

### A. Factual Background

All the record facts and evidence relevant to the applicability of § 3B1.3

are set out in Throne's plea agreement with the government. The plea agreement

provides as follows:

> Hunter Douglas, Inc. (HDI) and its affiliate, Hunter Douglas Window
> Fashions, Inc. (HDWFI), [are] in the business of designing,
> manufacturing, and fabricating window coverings . . . . HDWFI's
> place of business was Broomfield, Colorado.
>
> The defendant Jason Timothy Throne, a lawyer, joined HDI as
> an intellectual property counsel in 1993. He was promoted to
> intellectual property general counsel in 2001 and remained in that
> position until his HDI employment was terminated in June 2014.
> Until 2015, Throne was licensed to practice law in New Hampshire

and registered to practice in patent cases before the United States Patent and Trademark Office.

Throne's duties during the relevant times included managing and overseeing patents and trademarks for HDI and HDWFI; managing outside patent attorneys and outside inventors; evaluating and licensing inventors' technologies; the day-to-day management of patent and trademark litigation; advising senior management on patent and trademark issues; formulating, negotiating, and implementing licensing strategies; tracking the development of new products and processes within HDI's North American companies; establishing patent and trademark strategies for HDI; keeping inventors abreast of new technologies and inventions in the window coverings industry; advising in-house tax counsel on patent and trademark issues; and "brainstorming" with inventors and other company employees to assess the possibility of patenting new inventions, to enhance inventions, and to respond to competitive threats. In addition, Throne is listed as an inventor in forty-two of HDI's United States patents.

In September 2007, HDI provided Throne with a written policy statement that said full-time employees, such as him, could not have outside employment without approval. Throne . . . acknowledged that he understood that policy and signed an HDI form on which he checked a box next to the words, "No; I do not have a 2nd Job."

Throne resided in Colorado from the time he joined HDI until July 2004, when he moved to Maine. Beginning in 1995, while he lived in Colorado, and continuing until his employment ended, Throne worked primarily from his home . . . . His supervisors approved that arrangement.

. . . .

On December 29, 1999, Throne arranged for Patent Services Group, Inc. (PSG) to be incorporated in Colorado. At about the same time, he opened post office box 2019 in Boulder, Colorado, stating on a Postal Service application that the box would be used by PSG. In early 2000, Throne opened an account in the name of PSG at Vectra Bank in Steamboat Springs, Colorado.

Beginning in early 2000 and continuing to April 2014, Throne prepared 162 false PSG invoices, each addressed, "Jason T. Throne Hunter Douglas Inc.," and each showing the Boulder post office box as PSG's address. Throne stated on each invoice that PSG had performed patent searches for Hunter Douglas and that Hunter Douglas owed money to PSG for those services. After writing "OK to pay" and his initials on each of the invoices, Throne submitted them on a monthly basis to the accounting department at the HDWFI office in Colorado.

Relying on Throne's approvals, the accounting department paid the invoices by mailing HDWFI checks to the Boulder post office box between April 18, 2000, and April 25, 2014. . . . The total amount of the checks was $4,841,146.09.

After retrieving the checks from the post office, Throne deposited them into the PSG account at Vectra Bank. He then caused the money to be moved from that account to personal bank accounts and used it for . . . personal expenses.

Other than submitting the invoices to the HDWFI accounting department, Throne never mentioned PSG to anyone at HDI or HDWFI. Neither his supervisors nor any other Hunter Douglas employee was aware of any services provided by PSG. Physical searches of Hunter Douglas's files produced no memoranda, reports, summaries, analyses, or other materials documenting patent searches or any other services provided by PSG. . . .

On November 22, 2013, HDWFI's accounting department prepared a summary of the year's legal charges, including the payments to PSG, and emailed it to two company employees. One of the recipients was N.H., a patent engineer whom Throne . . . supervised . . . and who had assisted him in investigating patents and evaluating the enforceability of the company's intellectual property. . . . N.H. sent an email to the accounting department and to Throne, saying, "I have NO idea what all of the 'Patent services group' astronomical charges are." She asked Throne, "Jason, do you know what those are? I have never heard of that." Throne immediately contacted N.H. by telephone and told her that PSG was a patent search service and the payments had been approved. Later that day, Throne sent an email to N.H. and other HDWFI employees,

-4-

misrepresenting that PSG "is a patent search service that I use that tracks a number of different developments throughout the organization." He claimed that he used PSG "to conduct state of the art searches for different inventors and to conduct validity searches for are [sic] lawsuits, which for this year have been very high." In that email and in his earlier call to N.H., Throne continued to hide his relationship to PSG.

On June 3, 2014, two Hunter Douglas supervisors . . . , having determined there was a connection between Throne and PSG, confronted him about it. Throne responded by misrepresenting that his wife, as the owner of PSG, performed patent searches under his guidance. . . .

The government's position is that the patent searches described in the PSG invoices were not conducted and that Throne knew they were not conducted. The defendant's position is that he conducted the searches. . . .

The defendant agrees that, assuming he did the patent searches described in the PSG invoices, he nevertheless defrauded HDI and HDWFI out of $4,841,146.09 because arranging for such searches was his responsibility as a paid HDI employee.

R. Vol. I at 17-22 (footnote omitted).

## B.  Procedural Background

A United States Probation Officer prepared a Presentence Investigation Report ("PSR") that recommended a two-level enhancement to Throne's offense level because Throne's position of private trust significantly facilitated the commission and/or concealment of his mail fraud offense. *See* U.S.S.G. § 3B1.3. The PSR's recommendation was based exclusively on the stipulated facts set out in the plea agreement entered into by Throne and the United States. Both the government and Throne objected to the proposed § 3B1.3 enhancement, asserting

-5-

Throne's position as an attorney was not a significant factor allowing him to carry out the fraud. At the sentencing hearing, both the prosecutor and defense counsel repeated their previously lodged objections to the § 3B1.3 enhancement.

The district court overruled the objections, concluding the enhancement was appropriate. In so doing, the district court specifically recognized the substantial managerial discretion placed in Throne as Hunter Douglas's intellectual property general counsel:

> Essentially, I agree with the probation officer. The stipulated facts here are that his duties included managing and overseeing patent and trademarks for [Hunter Douglas and a subsidiary]. He managed the outside patent attorneys, the outside inventors, the day-to-day management of patents and trademark litigation, tracking and development of new products, et cetera.

The district court also found that Throne utilized that managerial discretion to facilitate the embezzlement: "He had authority to both approve and submit invoices for patent searches, which were then paid by the firm's accounting department without any further scrutiny. And it appears to me that if he weren't in this position of trust as their patent attorney, this couldn't have gone on for 15 years." The district court calculated the total offense level to be twenty-five and the criminal history category to be I, which yielded an advisory guideline range of fifty-seven to seventy-one months as to the mail fraud conviction. The court sentenced Throne to seventy-one months' imprisonment on the mail fraud count

and thirty-six months' imprisonment on the tax count and ordered the sentences to run concurrently.

## III. ANALYSIS

### A. Standard of Review

Whether a defendant occupied a position of trust under U.S.S.G. § 3B1.3 is "generally a factual matter" this court reviews for clear error. *United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007) (quotation omitted). "Nevertheless, this court review[s] a district court's interpretation of the Guidelines *de novo* to see if the correct standard was applied to the factual findings." *United States v. Arreola*, 548 F.3d 1340, 1345 (10th Cir. 2008) (quotation omitted).

### B. Discussion

Section 3B1.3 provides for an enhancement of a defendant's sentence if the defendant abuses a position of private trust "in a manner that significantly facilitated the commission or concealment of the offense." Thus, for this sentencing enhancement to apply, the record must demonstrate: (1) the defendant occupied a position of trust; and (2) the position of trust was used to facilitate significantly the commission or concealment of the crime. U.S.S.G. § 3B1.3; *Spear*, 491 F.3d at 1153.

### 1. Position of Private Trust

The commentary to § 3B1.3 makes clear that the defining characteristic of a position of public or private trust is the presence of professional or managerial discretion:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature.

U.S.S.G. § 3B1.3, cmt. n.1. "Our cases interpreting the guideline make clear that the term 'position of trust' is a bit of a misnomer. It actually has little to do with *trustworthiness* and everything to do with *authority* and *discretion*." *Spear*, 491 F.3d at 1154; *see also United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003) (holding that the lack of "any . . . authority to make substantial discretionary judgments" is key in determining whether the enhancement applies). "The discretion necessary to qualify for the enhancement exists where the person charged had the authority to make broad case-by-case decisions for the organization." *Spear*, 491 F.3d at 1155.[1]

---

[1]Throne asserts the district court erred in analyzing the applicability of § 3B1.3 to his conduct by focusing on his trustworthiness, rather than on whether his position as intellectual property general counsel was characterized by managerial or professional discretion. Although some isolated statements on the part of the district court at the sentencing hearing refer to Throne being a trusted employee of Hunter Douglas, the transcript of the sentencing hearing, when

(continued...)

The district court did not err in concluding Throne occupied a position of private trust as Hunter Douglas's intellectual property general counsel. The stipulated facts make clear Throne had authority to make substantial discretionary judgments. His authority included, among other duties, managing and overseeing Hunter Douglas's patents and trademarks; managing outside patent attorneys and inventors; formulating, negotiating, and implementing licensing strategies; tracking the development of Hunter Douglas products and processes; and "brainstorming" with inventors and company employees to assess the possibility of patenting new inventions, to enhance inventions, and to respond to competitive threats. Furthermore, given these undisputed facts, along with a further stipulation that Throne could have Hunter Douglas vendors paid via his signature authority, it was reasonable for the district court to infer that Throne had the power to choose necessary vendors and set those vendors' rates of compensation. In light of these facts, there is simply no doubt Throne occupied a position of private trust. *See Arreola*, 548 F.3d at 1346-47 (holding that an employee with authority to activate new vendors on employer's procurement system, together

---

[1](...continued)

considered as a whole, leaves no doubt the district court applied the correct legal test in concluding Throne occupied a position of private trust. That is, the district court specifically focused on Throne's exceedingly broad authority and discretion in managing all aspects of Hunter Douglas's intellectual property.

with authority to purchase goods and services valued up to $100,000, occupied a position of trust).

### 2. Significant Facilitation

Having determined the district court did not err in concluding Throne occupied a position of private trust, this court moves on to determine if that position was used in a "manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. "That step is satisfied where the person's duties allow the more effective commission of the crime by 'making the detection of the offense or the defendant's responsibility for the offense more difficult.'" *Spear*, 491 F.3d at 1155-56 (quoting U.S.S.G. § 3B1.3, cmt. n.1).

In light of this standard, there is simply no doubt the district court correctly concluded Throne's position of private trust (i.e., intellectual property general counsel) significantly facilitated his embezzlement of funds from Hunter Douglas. Based on Throne's management of Hunter Douglas's intellectual property portfolio, the record strongly supports an inference that Throne could (1) choose vendors for critical goods/services and (2) purchase necessary/desirable patents. From this it is quite easy to infer it would be necessary to do due diligence on acquisitions of intellectual property, including the use of a patent search entity. The record here makes clear Throne could use any such vendor he chose, including a fictitious vendor he created to siphon funds away from Hunter Douglas. These actions would not have been possible if the position Throne

-10-

occupied were merely ministerial.  *See United States v. Chee*, 514 F.3d 1106,
1118 (10th Cir. 2008) ("The primary concern of § 3B1.3 is to penalize defendants
who take advantage of a position that provides them freedom to commit or
conceal a difficult-to-detect wrong." (quotation omitted)).

## IV.  CONCLUSION

For those reasons set out above, the sentence imposed by the United States
District Court for the District of Colorado is hereby **AFFIRMED**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge