In the

# United States Court of Appeals
### For the Seventh Circuit

———

Nos. 02-1662 & 02-1949

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL BERKLEY AND
VAL JEAN HILLMAN,

*Defendants-Appellants.*

———

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 31—**Charles R. Norgle, Sr.**, *Judge.*

———

ARGUED FEBRUARY 18, 2003—DECIDED JUNE 20, 2003

———

Before RIPPLE, DIANE P. WOOD, and EVANS, *Circuit
Judges.*

EVANS, *Circuit Judge.* Val Jean Hillman certainly isn't
the first buyer to pay an exorbitant sum of money for a
house in Chicago. But he was more than willing to do so.
That's because his purchase came as part of an elaborate
series of flip transactions in which buyers acquired prop-
erty for up to ten times their value, then left mortgage
lenders holding an empty bag.

Under the direction of mastermind Henry White, one
schemer paid fair market value to purchase each of
seven Chicago properties. Then, misrepresenting the

value of the property and hiding the true identities of the buyers and sellers and the source of funds for the down payments, a second schemer obtained inflated mortgage loans to finance a subsequent purchase of each property at a tremendously inflated price. For each property, the second buyer then defaulted on the mortgage, taking the money from the inflated mortgage and leaving the mortgage lender with property worth substantially less than the amount of the loan. Altogether, White and friends ran off with more than $2 million that never would have been available to them absent fraudulent appraisals that persuaded lenders to authorize mortgage loans on the properties.

Hillman, who was a patent attorney at Motorola, served as an investor and a buyer in the scheme, providing down payments for the inflated sales to straw buyers, then getting that money back plus a substantial profit after the sales closed. In two of the properties at issue in this appeal, the schemers used fraudulent appraisals to obtain mortgages from UMG Funding, Inc., a mortgage broker who later sold one of the mortgage loans to Plaza Home Mortgage Bank (as described in count 1 of the indictment) and the other to Capstead Mortgage Corporation (count 3). The underwriters who approved the loans for UMG testified that UMG would not have made the loans if it had known the true nature of the purchases.

Hillman and Michael Berkley, a loan processor for UMG, were charged along with six others in a seven-count indictment. After their six cohorts pleaded guilty, Hillman and Berkley went to trial. A jury found Hillman guilty on three counts of wire fraud affecting a financial institution in violation of 18 U.S.C. §§ 2 and 1343. The jury also found Berkley guilty on one of two similar counts. The district court sentenced both men to 27 months imprisonment and ordered them to pay hundreds of thousands of dollars in restitution. Hillman and Berkley appeal their

convictions, essentially challenging the sufficiency of the evidence but acknowledging, because they failed to lodge a motion for a judgment of acquittal at the close of all the evidence or within 7 days after the adverse verdict, that they must show plain error to prevail. *See United States v. Taylor*, 226 F.3d 593, 596 (7th Cir. 2000). Therefore, we will reverse their convictions only if we find a manifest miscarriage of justice. And we can make that finding only "if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *United States v. Meadows*, 91 F.3d 851, 854-55 (7th Cir. 1996).

Though he does not explicitly admit to his part in the schemes described in counts 1 and 3 of the indictment, Hillman does not really deny his role, either. Instead, he claims the indictment was so narrowly written that it did not include his conduct, and, as a result, the district court should have entered a judgment of acquittal.

UMG's role in the schemes provides the basis for Hillman's claim. The schemers tricked UMG into granting the mortgage loans, which it then sold to Plaza Home and Capstead. Hillman makes two intertwined claims: that the government's evidence showed only an intent to defraud UMG, not the "lenders," as described in the indictment; and that the district court constructively amended the indictment with its jury instructions, which allowed for a conviction if the jury found a scheme to defraud "a" financial institution, not just one of the institutions named in the indictment.

Counts 1 and 3 of the indictment charged Hillman with wire fraud in violation of 18 U.S.C. § 1343 and aiding and abetting the violation by "knowingly divis[ing] and intend[ing] to devise a scheme and artifice to defraud Plaza Home Mortgage, Texas Commerce Bank, Fidelity Bank, and private mortgage lenders, including Long Beach Mortgage,

Capstead Mortgage Corporation, Residential Funding Corporation, and Ryland Mortgage (collectively, the 'Lenders') . . . ." Hillman argues that since the indictment charged him solely with intending to defraud Plaza Home and Capstead (and not UMG), the government should have been required to prove he had the specific intent to defraud Plaza Home and Capstead. Hillman is correct in claiming that the government did not prove that he intended to defraud Plaza Home or Capstead, nor could it have. Hillman intended only to defraud UMG—after fraudulently convincing UMG to supply the initial loans, Hillman didn't know or care whether or to whom UMG would sell them.

The government uses similar logic to make the opposite argument. It admits that it cannot prove that Hillman had the specific intent to defraud any particular financial institution because Hillman did not care which lender or broker possessed the mortgage when the borrowers defaulted. That means, according to the government, that requiring it to prove that Hillman had the specific intent to defraud a particular financial institution makes no sense because that would be an impossible burden to carry.

Though true in a sense, the government's argument misses Hillman's point. Hillman doesn't contend that the government should always have to prove the specific intent to defraud a particular financial institution in cases like this, only that the government brought the specific intent requirement upon itself by failing to include UMG in the indictment. Citing *United States v. Leichtnam*, 948 F.2d 370, 377 (7th Cir. 1991) ("an indictment . . . may not be *broadened*, so as to present the trial jury with more or different offenses than the grand jury charged"), Hillman says that the government made the decision to proceed on a narrow indictment. As a result, it is stuck with that choice and must prove that Hillman intended to defraud Plaza Home and Capstead, not UMG. In fact,

Hillman conceded during oral argument that the government could have written a broader indictment that would have precluded his appeal on counts 1 and 3.

That concession, along with Hillman's related claim that the district court constructively amended the indictment by broadening it in its jury instructions, highlights the fine line the government must walk in crafting an indictment. With a narrow indictment, the government runs the risk of being too specific, leading to claims of unfair surprise like the one Hillman makes here if the evidence goes beyond the scope of the indictment. But drafting an overly broad indictment runs the risk of opening the government up to the very same charge of unfair surprise because a broad indictment also fails to warn the defendant of the true nature of the allegations. *See United States v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002) ("[T]he Fifth Amendment requires . . . giv[ing] the defendant reasonable notice so that he may prepare a defense" (internal quotations omitted)).

Here, the government was close enough to the line to give Hillman reasonable notice and opportunity to plan his defense. Hillman argues that, by stipulating to the fact that UMG was "in the business of brokering mortgage loans to mortgage lenders," UMG cannot be one of the unnamed "private mortgage lenders" listed along with Plaza Home, Capstead, and others in the indictment. But the fact that UMG was defined as a broker does not mean that it was not also a lender. UMG generally acts as a broker, making loans and then selling them. For the short time in each of those deals after UMG has made the loan but before it can sell it, however, UMG acts as a private mortgage lender. In that sense, UMG was listed with Plaza Home and Capstead in the indictment, even though the economic reality of the transaction made Plaza Home and Capstead the true victims of the scheme.

More significantly, several parts of the indictment refer specifically to UMG and its role. Paragraphs 16 and 17 describe the fraudulent securing of the $352,000 mortgage loan for the 4553 South Ellis property (count 1), and paragraph 21 specifically names UMG Funding in describing the sale of that mortgage to Plaza Home. Similarly, paragraph 39 describes UMG Funding's role with respect to the property at 4547 South Ellis (count 3). Taken as a whole, the indictment describes UMG as a victim and adequately put Hillman on notice of that fact. Therefore, the district court did not commit plain error in failing to enter a judgment of acquittal on counts 1 and 3.

Similarly, the district court did not err by constructively amending the indictment in its jury instructions. The district court may have broadened the indictment by allowing the jury to convict if it found intent to defraud *any* financial institution (as opposed to one specifically named or a "private mortgage lender" as defined in the indictment), but we need not reverse the judgment because that constructive amendment does not "constitute a mistake so serious that but for it the [defendant] probably would have been acquitted . . . ." *Trennell*, 290 F.3d at 887 (internal quotations omitted). Had the jury instruction been limited to the financial institutions named or referred to in the indictment (including UMG as a "private mortgage lender"), the jury almost certainly would have reached the same result, as all of the evidence the jury considered went to Hillman's dealings with those financial institutions.

Hillman also argues that the district court erred in failing to enter a judgment of acquittal on count 4 of the indictment, which charged Hillman for his role in a similar flip transaction on a different property. Hillman claims the government failed to prove that he knew there was a scheme to defraud, so the government could not have proven that he intended to participate in the scheme.

Hillman supplied the buyers of the property described in count 4 with $46,000 for a down payment, then promptly received a check for $56,000.

Hillman's argument has little merit. He knew about the schemes White had orchestrated, having already participated in several of them. As evidence of that knowledge, the government showed that Hillman had approached White to demand a larger share of the illegally obtained profits. Finally, evidence showed that when Hillman was shown an appraisal for $425,000 (nearly 10 times the property's fair market value), he "kind of laughed about it." Therefore, a reasonable jury had plenty of evidence to conclude that Hillman was a knowing and willing participant in the scheme.

Berkley also claims the government failed to present sufficient evidence to support his conviction. Berkley was working as an office manager at UMG when he met White, who brought Berkley into the scheme by offering him $5,000 to help with the loan application for one of the properties. Berkley wrote up the loan application, overstating the buyer's income and assets in the process and falsely stating that the buyer intended to live in the property. The application also falsely stated that the buyer would provide the down payment and that the buyer had $65,000 on hand at AFG International, a company controlled by White. Berkley then submitted the loan application to Chicago Financial Services, a mortgage broker which in turn sent the loan package to Ryland Mortgage Corporation. Ryland approved the request and granted a $336,000 loan. A week after the deal closed, White paid Berkley $6,500.

Berkley admits to working on the loan application but claims that he was not aware that the information he was providing was false. As a result, he says he did not have the intent to defraud required under 18 U.S.C. § 1343.

At trial, though, an FBI agent testified that Berkley told him that he knew the buyer would not be supplying the down payment, and that the buyer could not have had $65,000 at AFG International. That evidence was sufficient for a reasonable jury to find that Berkley knew he was providing false information, thus satisfying the intent requirement.

AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*