# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2306

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Edward Arnold Septon, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 12, 2009
Filed: March 12, 2009

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Edward Septon pleaded guilty to bank fraud in violation of 18 U.S.C. § 1344, and conspiring to commit mail and bank fraud in violation of 18 U.S.C. §§ 371, 1341 & 1344. The district court[1] sentenced him to 70 months of imprisonment. He appeals challenging two sentencing enhancements the district court used to calculate the advisory guideline range. We affirm.

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

I

Septon was a mortgage broker and loan officer. He owned and managed First Rate Mortgage Group, a mortgage brokering business in the Minneapolis, Minnesota, metropolitan area. Beginning in 2000 and continuing through August 2004, Septon directed his employees to submit fraudulent loan applications and other documents to banks and mortgage lending companies. The fraudulent applications concealed the fact that Septon – through the use of subsidiaries of First Rate Mortgage and other associated businesses controlled by Septon[2] – was providing "bridge loans" to buyers for their down payments. Septon also sometimes used his associated businesses to act as sham employers for borrowers in order to falsely verify and substantiate their sources of income. In addition, the loan applications falsely inflated borrowers' assets and income, falsely described borrowers' employment, and contained forged signatures as well as falsified or altered tax returns, pay stubs, gift letters, bank statements, and bank notes. Between sixty-five and eighty percent of all loans brokered by First Rate were fraudulent.

Septon profited from this scheme by collecting interest on the bridge loans. He also obtained commissions and fees for brokering the loans ultimately approved by banks or mortgage lending companies. Many of the fraudulent loans went into default, causing losses in excess of $2 million.

After a lengthy investigation, the United States filed a two-count information charging Septon and five others with conspiring to commit mail and bank fraud, and bank fraud. Septon pleaded guilty to both counts of the information pursuant to a

_____

[2]The various entities associated with the fraud scheme included New Millenium Capital Corporation, New Millenium Financial Corporation, New Millenium Homes, New Millenium Construction, Melioration Corporation, Interumfund, Inc., New Perspective Realty, Innovatuity, Tospen Consulting LLC, Tospen Marketing, and First World Corporation.

negotiated plea agreement. In the plea agreement, the parties agreed to a base offense level of seven pursuant to U.S. Sentencing Guidelines (U.S.S.G.) § 2B1.1, a sixteen-level enhancement under U.S.S.G. § 2B1.1(b)(1) based on the amount of loss, a four-level enhancement under U.S.S.G. § 3B1.1 based on Septon's role in the offense, and a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, resulting in a stipulated guideline range of 51-63 months under Criminal History Category I.

Septon was the last of the five conspirators to plead guilty, and his plea agreement did not contain an agreement for the government to file a downward departure motion under U.S.S.G. § 5K1.1 based on Septon providing substantial assistance. The parties also agreed the district court would make its own determination regarding the applicable guideline factors, and Septon could not withdraw from the agreement if the district court's calculations differed from the parties' stipulations.

At the time of sentencing, the district court determined two additional enhancements should apply in calculating the advisory guideline range: 1) a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C) based on the offense involving the use of sophisticated means; and 2) a two-level enhancement under U.S.S.G. § 3B1.3 based on the defendant abusing a position of trust. As a result of these two additional enhancements, the district court determined the advisory guideline range to be 78-97 months. The district court then varied downward and imposed a sentence of 70 months, concluding such a sentence was "sufficient to punish this defendant and [protect] the interests of the public."

Septon filed a timely appeal challenging the district court's enhancements for sophisticated means and abuse of position of trust.[3]

## II

The legal conclusions a district court reaches in order to apply an enhancement for purposes of calculating an advisory guidelines range are reviewed de novo, while the factual findings underpinning the enhancement are reviewed for clear error. United States v. Blankenship, 552 F.3d 703, 707 (8th Cir. 2009).

Septon first contends the district court erred by including an enhancement for use of sophisticated means when calculating the advisory guideline range. The enhancement for sophisticated means applies when the offense involves "especially complex or . . . intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. 8(b). One of the examples specifically mentioned by the Sentencing Commission is when a defendant "hid[es] . . . transactions . . . through the use of fictitious entities [or] corporate shells." Id.

Septon used a variety of business entities to facilitate his fraudulent scheme and to hide from lenders the fact that he was providing bridge loans to borrowers. He also sometimes used those same entities to act as sham employers for borrowers in order to falsely verify and substantiate their sources of income. This is similar to hiding transactions through the use of fictitious entities – the type of conduct specifically

---

[3]On appeal, Septon also complains the district court was obliged to hold an evidentiary hearing on a belated motion he filed challenging the government's failure to file a motion under U.S.S.G. § 5K1.1. This issue was not properly preserved for appellate review, see United States v. Murphy, 248 F.3d 777, 779-80 (8th Cir. 2001) (explaining the circumstances in which a defendant waives the right to challenge the government's failure to file a motion for downward departure based on substantial assistance), and we therefore do not address it.

mentioned by the Sentencing Commission as justifying a sophisticated means enhancement. In addition, Septon's scheme involved submitting numerous loan applications to lenders containing forged signatures, forged notary stamps, and falsified or altered tax returns, pay stubs, gift letters, bank statements, and bank notes. In United States v. Halloran, 415 F.3d 940 (8th Cir. 2005), we held a district court did not commit error by imposing an enhancement for sophisticated means where the scheme involved "a complex series of false property transfers using false identifications, a corporate front, forged notary stamps, fraudulent documents, forged signatures, [and] fraudulently filed documents." Id. at 945. Similarly, in this case, the district court did not err in applying the sophisticated means enhancement.

Septon next contends the district court erred in imposing an enhancement for abuse of a position of trust. Septon contends an arms-length commercial relationship between a defendant and a victim, such as the broker/lender relationship involved here, does not constitute a trust relationship sufficient to apply the enhancement. See, e.g., United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996) (explaining courts "must carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction" and holding that an enhancement for abuse of a position of trust should only apply in the latter situation). Septon further contends a relationship akin to a fiduciary relationship is required between the defendant and the victim for the enhancement to apply, and that there was no fiduciary relationship between Septon and the lending institutions.

While we agree an arms-length commercial relationship will ordinarily not suffice for the enhancement to apply, in United States v. Baker, 200 F.3d 558 (8th Cir. 2008), we explained that the issue of whether an abuse-of-trust enhancement applies "is fact intensive because it turns on the precise relationship between the defendant and [his] victims and therefore cannot be decided on the basis of generalities such as

lawyers and doctors occupy positions of trust but bank tellers and insurance agents do not." Id. at 564 (internal quotation marks omitted). We have upheld the application of the enhancement in situations involving arms-length commercial relationships. See United States v. Fazio, 487 F.3d 646, 659 (8th Cir. 2007) (involving the relationship between an insurance agent and out-of-state mortgage companies); United States v. Erhart, 415 F.3d 965, 972 (8th Cir. 2005) (involving the relationship between a chiropractor and the insurance companies to which he submitted claims for reimbursement). We have also held there can be an abuse of a position of trust even in the absence of a traditional fiduciary relationship between a defendant and a victim. See. e.g., United States v. Goldman, 447 F.3d 1094, 1096 (8th Cir. 2006) (involving an attorney's false testimony in bankruptcy proceedings).

In United States v. Wright, 496 F.3d 371 (5th Cir. 2007), the Fifth Circuit affirmed a district court's application of the abuse-of-trust enhancement to the relationship between a mortgage broker and lenders. The court explained:

Although there is no legally recognized-relationship of trust between brokers and lenders, such legal recognition is not required, and the undisputed record in this case reveals that lenders often rely to some degree on statements by brokers in evaluating applications. That lenders, who are generally distrusting and like to verify information for themselves, would do so makes more sense given that brokers independently verify all relevant information before submitting applications and that brokers deal repeatedly with the same lenders and multiple lenders, unlike the average borrower. The relationship here is not lender-borrower, which we agree will seldom be a relationship of trust. It's lender-middleman, and there is a difference. We inquire if there is a position of trust against the background reality that, wherever there is fraud the victim relies on the defendant's statements, so there must be more than just reliance based on factors idiosyncratic to the case at hand. Here there is reliance that flows from the structure of the mortgage industry itself, which sets a patterned process for loan application that over time cultivates trust between brokers and lenders.

-6-

In sum, on the facts before it the district court did not clearly err in concluding that Wright abused his position of trust as a mortgage broker.

Id. at 377.

We agree with the Wright court. Given the particular characteristics involved in the relationship between a mortgage broker and a lender, the district court did not err in applying the abuse-of-trust enhancement.

III

We affirm the judgment of the district court.

_____