In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1611

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MITCHEL A. FUCHS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 07 CR 50072-1—**Frederick J. Kapala,** *Judge*.

ARGUED APRIL 27, 2010—DECIDED MARCH 17, 2011

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Mitchel Fuchs brokered subprime mortgages by enticing lenders with falsified loan applications and phony documentation. He was convicted after a jury trial of mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343. After applying a number of sentencing guidelines adjustments, including a two-level increase for abuse of a position of trust, *see* U.S.S.G. § 3B1.3, the district court calculated Fuchs's imprisonment range at

100 to 125 months. The court went above that range and imposed a total of 144 months' imprisonment. We conclude that the court erred in applying the abuse-of-trust increase under § 3B1.3. Accordingly, we vacate the sentence and remand for resentencing.

## I. Background

Fuchs used an alias to land a job with Mortgage Solutions, a broker in Rockford, Illinois, that helped its clients finance residential real-estate transactions. Most of the loans Fuchs brokered were denominated as "subprime" because the borrower's credit rating was so poor that only a lender specializing in high-risk loans was willing to provide a mortgage. S*ee Hoffman v. Grossinger Motor Corp.*, 218 F.3d 680, 681 (7th Cir. 2000). For every loan Fuchs generated, he earned a commission averaging between $2,000 and $3,000. Fuchs and his subordinates—two of whom would become his codefendants—gathered information from borrowers about their income, employment, assets, and credit history, and submitted loan applications on their behalf to several subprime lenders.

What the lenders did not know is that many of the borrowers were poor risks even for subprime loans. Fuchs and his two codefendants hid this fact by doctoring the loan applications with, for example, inflated incomes or phony employers, and often they altered credit reports or fabricated W-2s to corroborate the lies in the loan applications. Most times the lenders relied on the information from Fuchs without verification, but sometimes a lender contacted a listed employer

or obtained a credit report independently. If a lender did try calling a bogus employer, the phone number Fuchs supplied on the loan application would lead back to him or his fiancée. When the FBI got wind of the scheme and raided Mortgage Solutions in June 2004, Fuchs simply took another name and found another job with Leader Mortgage, a different broker where he continued the fraud unabated. Investigators eventually connected him to at least 14 fraudulent loans; many of those predictably went into foreclosure. These lenders lost about $184,000.

In preparation for sentencing, the government proposed an increase under U.S.S.G. § 3B1.3 on the ground that Fuchs held and abused a position of trust with respect to the lenders. That section of the guidelines provides for a two-step increase in offense level if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.1; *see also United States v. Podhorn*, 549 F.3d 552, 560 (7th Cir. 2008); *United States v. Thomas*, 510 F.3d 714, 724-25 (7th Cir. 2007). The probation officer evaluated but ultimately rejected the government's position. In drafting the presentence report, the probation officer expressed skepticism that the lenders had relied on Fuchs rather than exercising independent judgment. The probation officer reasoned that Fuchs himself was not licensed as a mortgage broker (although his employers presumably were, *see* 205 ILL. COMP. STAT. 635/1-3). And Fuchs was not supervised by the lenders and had never attested to the accuracy of the information he gave them.

Moreover, the probation officer explained, the lenders sometimes tried to "double check" information in the loan applications and were depending on the borrowers to be truthful.

The government objected to the probation officer's conclusion and highlighted evidence from trial that it said showed the lenders had relied upon Fuchs to a significant degree. Employees of the defrauded lenders testified that their financial institutions lacked brick-and-mortar offices and transacted business only through brokers and never met the borrowers. The lenders did not employ loan officers and instead relied upon brokers to evaluate and process loan applications. The relationship between lender and broker was typically embodied in an agreement that the broker was required to sign before obtaining authorization to promote the lender's products. These written agreements required the broker to verify a borrower's income, employment, and source of down payment, although the example submitted at sentencing specifically disclaims an agency relationship. The borrower's representations in a loan application often (though not always) went unverified. Thus, the government argued, an increase under § 3B1.3 for abuse of trust was warranted.

The district court sided with the government. The court held that Fuchs's position as a broker had facilitated the fraudulent scheme and allowed its concealment, and that the lenders had relied on Fuchs to provide them with accurate information. The court discounted the fact that Fuchs was unlicensed and that the

lenders occasionally verified the information he provided; these verification procedures, the court noted, were thwarted because Fuchs placed his contact information on the fraudulent documents. Last, the district court relied on *United States v. Wright*, 496 F.3d 371 (5th Cir. 2007), in which the Fifth Circuit upheld the application of § 3B1.3 to a mortgage broker who provided false information to lenders.

The district court also concluded that Fuchs had abused a position of trust with respect to borrowers who were placed at risk of defaulting, further impairing their credit when they obtained financing for which they did not qualify. The government had not sought the adjustment on this basis. Before trial the government had conceded that the borrowers were not victims and acknowledged that the borrowers arguably knew or should have known that Fuchs was submitting fraudulent documents on their behalf.

## II. Discussion

The sole issue on appeal is whether the § 3B1.3 enhancement for abuse of a position of trust was properly applied. Fuchs argues that he did not occupy a position of trust with respect to the lenders and thus it was error to assess the two-level increase. According to Fuchs, the record establishes only an arm's-length, commercial relationship between him and the lenders. We review the district court's interpretation of § 3B1.3 de novo and its underlying factual findings for clear error. *Thomas*, 510 F.3d at 725; *United States v. Andrews*, 484 F.3d 476, 478-79 (7th Cir. 2007).

The relationship between Fuchs and the lenders would be unimportant if, as the district court found, he also abused a position of trust with respect to the *borrowers. See United States v. Fiorito,* No. 07-CR-0212(1) (PJS/JSM), 2010 WL 1507645, at *36 (D. Minn. Apr. 14, 2010) (applying § 3B1.3 adjustment to mortgage broker who required borrowers to give him power of attorney, hid details of fraudulent transactions, and directed borrowers to sign documents without reviewing them). Under established Illinois law, Fuchs was an agent of the borrowers, *see* 205 ILL. COMP. STAT. 635/5-7, and agency carries with it fiduciary duties, *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004) (applying Illinois law); *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (applying Illinois law); *People v. Riggins*, 132 N.E.2d 519, 522 (Ill. 1956); *Amigo's Inn, Inc. v. License Appeal Comm'n of Chi.*, 822 N.E.2d 107, 113 (Ill. App. Ct. 2004); *Kaporovskiy v. Grecian Delight Foods, Inc.*, 787 N.E.2d 268, 272 (Ill. App. Ct. 2003).

As a fiduciary Fuchs occupied a position of trust with respect to legitimate borrowers, and so the upward adjustment might on the surface seem appropriate. *See United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002) (noting that defendant's fiduciary duty vis-à-vis investors in his company placed him in a position of private trust); *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir. 1997) (upholding application of § 3B1.3 to a majority shareholder who diverted revenue from a corporation because under hornbook law of corporations, defendant had fiduciary duty to minority shareholders); *see also Payne v. United States*, 566 F.3d 1276, 1277 (11th Cir.

2009) (stating that increase under § 3B1.3 is appropriate where fiduciary relationship exists); *United States v. Kennedy*, 554 F.3d 415, 425 (3d Cir. 2009) (upholding application of § 3B1.3 to account manager who stole client funds because fiduciary relationship existed); *United States v. Day*, 524 F.3d 1361, 1374 (D.C. Cir. 2008) (upholding application of § 3B1.3 to defendant who operated as a fiduciary of employee benefit plans he embezzled from); *United States v. Tatum*, 518 F.3d 369, 374 (6th Cir. 2008) (stating that the rationale underlying § 3B1.3 is akin to punishment for violating a fiduciary duty); *United States v. Hirsch*, 239 F.3d 221, 227-28 (2d Cir. 2001) (upholding application of § 3B1.3 to broker/investment advisor who defrauded investors with whom he had fiduciary relationship). And arguably, Fuchs has waived any challenge to the district court's conclusion about his relationship to the borrowers because he failed to address this alternative holding on appeal. *See Maher v. City of Chicago*, 547 F.3d 817, 821 (7th Cir. 2008); *United States v. Hatchett*, 245 F.3d 625, 644-45 (7th Cir. 2001).

But the government has waived Fuchs's waiver by declining to defend the district court's application of § 3B1.3 on this alternative ground. *See United States v. Archambault*, 62 F.3d 995, 998 (7th Cir. 1995); *United States v. Baker*, 40 F.3d 154, 160 (7th Cir. 1994). And for good reason. Before trial, prosecutors conceded that the borrowers either had actual knowledge of the fraud—which would make them coconspirators, not victims—or at least should have known of the fraud. *See United States v. Berkley*, 333 F.3d 776, 777-78 (7th Cir. 2003) (upholding buyer's convictions for wire fraud based on false state-

ments in mortgage applications); *United States v. Brown*, 352 F.3d 654, 657-58 (2d Cir. 2003) (upholding conviction for mail fraud where defendant lied about employment status in mortgage application). The government thus took the position that "only the mortgage companies were the victims and suffered the financial losses." That concession undermines the district court's finding that an increase under § 3B1.3 could be applied based on Fuchs's relationship with the borrowers. Since the government has declined to defend the application of the enhancement on this ground, we need not decide whether the increase could have been sustained on that basis.

This brings us back to Fuchs's relationship with the lenders, and on that question we agree with him that the government did not establish anything more than an ordinary, commercial relationship, which we and other circuits have said isn't enough to warrant an upward adjustment under § 3B1.3. *See, e.g., Andrews*, 484 F.3d at 479; *United States v. Thorn*, 446 F.3d 378, 388 (2d Cir. 2006); *United States v. Ebersole*, 411 F.3d 517, 536 (4th Cir. 2005); *United States v. Liss*, 265 F.3d 1220, 1229 (11th Cir. 2001); *United States v. Haber*, 251 F.3d 881, 891 (10th Cir. 2001); *United States v. Dorsey*, 27 F.3d 285, 289 (7th Cir. 1994); *United States v. Kosth*, 943 F.2d 798, 800 (7th Cir. 1991).

In reaching this conclusion, we do not rely on Fuchs's assertion that as a matter of law, he could not have been in a position of trust because he did not have the authority to access or control the lenders' assets. Fuchs reads several of our cases to stand for the proposition

that § 3B1.3 applies *only* if the defendant is given control over valuables. It is true that control over assets is a significant factor in many cases. *See, e.g., United States v. Peterson-Knox,* 471 F.3d 816, 825-26 (7th Cir. 2006) (upholding application of § 3B1.3 to company manager responsible for supplying laptops who shipped computers to herself and coconspirators); *United States v. Frykholm,* 267 F.3d 604, 612-13 (7th Cir. 2001) (upholding application of § 3B1.3 to defendant who misrepresented herself as investment broker and obtained control over investors' money). And the government does not dispute that such access and control was absent here. But we have cautioned against using bright-line rules when applying § 3B1.3. *Andrews,* 484 F.3d at 479. We have upheld upward adjustments even when the defendant had no access to or authority over the victim's valuables. *See United States v. Snook,* 366 F.3d 439, 445-46 (7th Cir. 2004) (upholding application of § 3B1.3 to company manager responsible for reporting compliance with environmental regulations); *United States v. Vivit,* 214 F.3d 908, 924 (7th Cir. 2000) (upholding application of § 3B1.3 to medical-services provider responsible for administering medical treatment); *United States v. Hoogenboom,* 209 F.3d 665, 671 (7th Cir. 2000) (same); *United States v. Gellene,* 182 F.3d 578, 596-97 (7th Cir. 1999) (upholding application of § 3B1.3 to attorney responsible for exercising professional discretion).

Conversely, a defendant's ability to access or control the victim's valuables does not always trigger an increase under § 3B1.3. *See Dorsey,* 27 F.3d at 289. A bank teller, for example, might have access and control over sig-

nificant amounts of cash, but § 3B1.3 "does not apply in the case of an embezzlement or theft by an ordinary bank teller." U.S.S.G. § 3B1.3 cmt. n.1. Rather, a defendant's authority over the victim's valuables and the degree of discretion given to the defendant by the victim are simply indicia of the victim's special trust and reliance, and *that* is the common thread in these decisions. *See United States v. Brown*, 47 F.3d 198, 205-06 (7th Cir. 1995) (rejecting application of § 3B1.3 where defendant obtained fraudulent loan but had only commercial relationship with bank); *United States v. Stewart*, 33 F.3d 764, 769 (7th Cir. 1994) (upholding application of § 3B1.3 to insurance broker who exploited trust of elderly clients); *Dorsey*, 27 F.3d at 289 (rejecting application of § 3B1.3 to car dealer who defrauded lender where no evidence of reliance existed apart from standard commercial arrangement); *United States v. Boyle*, 10 F.3d 485, 489 (7th Cir. 1993) (upholding application of § 3B1.3 to president of armored-car company because he was agent of his victims); *Kosth*, 943 F.2d at 800 (rejecting application of § 3B1.3 to defendant who defrauded bank through use of merchant account but was not "an insider" of bank).

We have explained that § 3B1.3 "encourages trust by making trust less risky to the trusting, and trust is an efficient substitute for continuous surveillance." *United States v. Deal*, 147 F.3d 562, 563 (7th Cir. 1998). But this understanding of the guideline should not be confused with lax supervision or the victim's abdication of his own duties. *See United States v. Ollison*, 555 F.3d 152, 167-69 (5th Cir. 2009) (overturning increase under § 3B1.3 where secretary's sustained misuse of business credit

card went undetected, not because her job entailed substantial discretionary judgment but because of lax supervision); *United States v. Brunson*, 54 F.3d 673, 678 (10th Cir. 1995) (overturning increase under § 3B1.3 where defendant's fraud could have been detected even by unsophisticated businessman); *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994) (overturning increase under § 3B1.3 where defendant's commission of bank fraud was made possible by lack of "routine precautions" rather than his position); *United States v. Helton*, 953 F.2d 867, 869-70 (4th Cir. 1992) (holding that § 3B1.3 could not be applied to cashier who embezzled traveler's checks where fraud would have been quickly detected if supervisors had not been "inept" and "derelict in their duty"); *see also* Joshua A. Kobrin, *Placing Trust in the Guidelines: Methods and Meanings in the Application of Section 3B1.3, the Sentence Enhancement for Abusing a Position of Trust,* 12 ROGER WILLIAMS U. L. REV. 121, 151-52 (2006) (explaining that trust arising from ineptitude or accident is not what § 3B1.3 protects). There is an element of misplaced trust inherent in every fraud, *e.g.*, *United States v. Hayes*, 574 F.3d 460, 479 (8th Cir. 2009); *United States v. Williams*, 527 F.3d 1235, 1250-51 (11th Cir. 2008); *Wright,* 496 F.3d at 377; *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996); *United States v. Ragland*, 72 F.3d 500, 502-03 (6th Cir. 1996); *Kosth*, 943 F.2d at 800, and so what is required is a showing that the victim placed more than the ordinary degree of reliance on the defendant's integrity and honesty, *Hayes*, 574 F.3d at 479; *Williams*, 527 F.3d at 1250-51; *see also United States v. Hernandez,* 231 F.3d 1087, 1091 & n.2 (7th Cir. 2000) (recognizing that lax supervision is

not evidence of trust, though autonomy given to em-
ployee in performing job may be).

In Fuchs's situation the information before the district
court was unremarkable. His fraud convictions do not
themselves justify the application of § 3B1.3. He did take
advantage of the lenders, but their reliance (or for that
matter, his success) was not an element necessary to
convict him of mail or wire fraud. *Bridge v. Phoenix Bond &
Indem. Co.*, 553 U.S. 639, 648-49 (2008); *Neder v. United
States*, 527 U.S. 1, 24-25 (1999); *see also United States v. Rosby*,
454 F.3d 670, 674 (7th Cir. 2006). Fuchs's position as a
middleman between the borrowers and lenders does not
imply a special relationship with the lenders.

The government and the district court rely on opinions
from the Fifth and Eighth Circuits upholding the ap-
plication of § 3B1.3 to mortgage brokers who defrauded
their lenders. *United States v. Septon*, 557 F.3d 934, 937-38
(8th Cir. 2009); *Wright*, 496 F.3d at 375-77. In both *Septon*
and *Wright*, as here, the mortgage-broker defendants
submitted falsified loan applications to obtain mort-
gages for borrowers. *Septon,* 557 F.3d at 935-36; *Wright,* 496
F.3d at 372-73. In *Wright* the district court had applied
§ 3B1.3 based on an FBI agent's generic testimony that
lenders expect that mortgage brokers verify the informa-
tion supplied by the buyer. 496 F.3d at 376. The Fifth
Circuit upheld the application of the enhancement,
stating that although there is not a legally recognized
relationship of trust between mortgage-loan brokers
and lenders, lenders who deal with brokers on a repeti-
tive basis "rely to some degree on statements by brokers

in evaluating applications." *Id.* at 377. The Fifth Circuit acknowledged that something more than ordinary reliance is typically required for § 3B1.3 to apply, but reasoned that a finding of reliance "flows from the structure of the mortgage industry itself, which sets a patterned process for loan application that over time cultivates trust between brokers and lenders," and justifies an increase under § 3B1.3. *Id.* This same approach was adopted by the Eighth Circuit in *Septon.* 557 F.3d at 938.

Neither *Wright* nor *Septon* identifies any factor apart from the general "structure" of the commercial relationship between mortgage broker and lender to justify applying § 3B1.3. The workings of the mortgage industry *may* cultivate a heightened degree of trust between mortgage brokers and lenders in a particular case, e.g., where the same broker deals repeatedly with the same lenders, but neither *Wright* nor *Septon* discusses whether the defendants in those cases *actually* enjoyed this special trust. The Fifth Circuit recognized that the question was a "close call," *Wright*, 496 F.3d at 377, but in the end appears to have fashioned a per se rule that mortgage brokers *always* occupy a position of trust with lenders based on reliance flowing "from the structure of the mortgage industry itself," *id.* at 375-77. To the extent that the Fifth Circuit adopted a per se approach (and the Eighth Circuit followed suit), we respectfully disagree.[1]

---

[1] This opinion has been circulated to all active judges under Circuit Rule 40(e); none asked to hear this case en banc.

Again, we have cautioned against drawing bright lines defining where a position of trust begins or ends, *see Andrews,* 484 F.3d at 479, and we've repeatedly emphasized that the § 3B1.3 inquiry is case-specific and that a job title cannot answer whether the defendant is in a position of trust, *see, e.g., id.*; *Snook,* 366 F.3d at 445; *Mabrook,* 301 F.3d at 510; *Hernandez,* 231 F.3d at 1089. This is not to say that a mortgage broker can *never* occupy a position of trust with respect to his lenders. *See United States v. Castellano*, 349 F.3d 483, 484-85 (7th Cir. 2003) (recognizing that relationship that began as arm's-length, commercial relationship *progressed* into a special relationship of trust); *United States v. Pappert*, 112 F.3d 1073, 1080 (10th Cir. 1997) (same). But whether a mortgage broker actually *does* occupy a position of trust ultimately depends on the particular facts of the case. S*ee Andrews,* 484 F.3d at 479; *Snook,* 366 F.3d at 445; *Mabrook,* 301 F.3d at 510; *Hernandez,* 231 F.3d at 1089.

The limited evidence here fails to show that Fuchs (or the companies he worked for) occupied a special relationship of trust with any lender. To support the adjustment, the government argues that the lenders are not "typical banks" with branch offices. These lending institutions, the government explains, are not the kind where a borrower can "walk in off the street and just talk to one of their loan officers and get a loan." The government also points to the testimony from employees of the lenders who said that their loan products were offered only through brokers and that the brokers effectively functioned as loan officers by meeting with borrowers, obtaining necessary information, verifying income and

employment, and submitting the completed application to the lender for review. We and other circuits have upheld a district court's application of § 3B1.3 to loan officers who misapplied funds and concealed their behavior. *See United States v. Humphrey*, 279 F.3d 372, 381 (6th Cir. 2002) (observing that loan officer involves fiduciary relationship that would make application of § 3B1.3 appropriate)*; United States v. Jobe,* 101 F.3d 1046, 1065-66 (5th Cir. 1996); *United States v. Dion,* 32 F.3d 1147, 1150 (7th Cir. 1994).

But this testimony and the rest of the government's argument rests on generalities. During the sentencing proceeding, the government did not establish that the lenders in this case had a relationship of trust *with Fuchs* in particular. That is, the government introduced no evidence explaining the nature of the relationship between Fuchs or his employers and the victim lenders. In fact, the government did not even disclose the actual written agreements the lenders had with these brokers. What the evidence *does* tell us is that the victim lenders *sometimes* verified Fuchs's work but more often than not they didn't. On this record, an inference that the lenders operated this way based on their trust in Fuchs is no stronger than the inference that they simply failed to do their own due diligence. All we can do is speculate because aside from the general evidence of the industry of which Fuchs was a part—in which there is a statutory agency relationship between Fuchs and the *borrowers,* 205 ILL. COMP. STAT. 635/5-7—there is nothing pointing to a special relationship of trust outside of the ordinary arm's-length, commercial relationship between him and the lenders.

Accordingly, we VACATE the sentence and REMAND for resentencing without the § 3B1.3 adjustment.