NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 5, 2013
Decided April 1, 2013

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 12-1914

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *Plaintiff-Appellee*, | Appeal from the United States District <br> Court for the Eastern District of Wisconsin. |
| *v.* | No. 11-CR-122 |
| DORI F. MCGESHICK, <br> *Defendant-Appellant*. | William C. Griesbach, <br> *Chief Judge*. |

**O R D E R**

Dori McGeshick, a tribal employee, helped administer a federal grant to build 11 new homes on a Native American reservation. Tasked with acquiring appliances for the new homes, McGeshick took the opportunity to improve her lifestyle, using federal funds to buy $13,000 worth of high-end appliances for her own home. After a bench trial, the district court convicted her of the offense of theft by an employee of an Indian tribal government, *see* 18 U.S.C. § 666(a)(1)(A), and sentenced her to 15 months' imprisonment. On appeal McGeshick argues that the district court clearly erred when it found that she had abused a

position of trust. *See* U.S.S.G. § 3B1.3. Because she was entrusted with considerable discretion and responsibility, we affirm.

After passage of the American Recovery and Reinvestment Act in 2009, Pub L. No. 111-5, 123 Stat. 115, the Sokaogon Chippewa Native American tribe applied for a grant to build homes on the Mole Lake Reservation in northern Wisconsin. McGeshick, a community planner employed by the tribal housing department, was named in the grant application as a proposed member of the project's "Managerial and Technical Staff." The application cited McGeshick's nine years of work with a civil and environmental engineering firm, where she was responsible for "project oversight, environmental assessments, verification of pay requests, and preparation contracts." McGeshick's role, according to the application, would be to "assist in the overall administration of the project." The application was successful, and the federal government authorized the tribe to spend nearly two million dollars to build 11 houses for tribal members.

Once the grant was approved, McGeshick worked closely with the tribe's housing director, Jeff Ackley, to administer the project. Only Ackley could approve the expenditure of federal funds, and checks related to the project had to be signed by Ackley and the tribal chairman. Ackley technically controlled the project's purse strings, so McGeshick regularly went to him when the project required the expenditure of federal funds and Ackley routinely granted these requests and signed off on the expenditures. To support these requests for funding, McGeshick would prepare spreadsheets that showed to whom the tribe owed money, and how much the tribe owed. These documents did not detail the goods or services being paid for.

One of McGeshick's assignments was to obtain appliances (including refrigerators, dishwashers, washers, and dryers) for the new homes, a task that ultimately resulted in her conviction. Although Ackley and McGeshick discussed a few general features of the appliances—for example, Energy Star certification and color—McGeshick alone dealt with the nuts and bolts of the purchasing process: She contacted retailers, selected the appliances, obtained price quotes, and personally delivered payment checks to the seller. While shopping for the project's appliances, she also sought information about high-end appliances for a new home she was planning to build (which was not one of the 11 homes being built as part of the project). She used federal funds to purchase these appliances—valued at around $13,000—for her own home, in addition to 11 sets of more modestly priced appliances for the project.

To obtain these funds, McGeshick approached Ackley in December 2009, well before the project's homes were ready to have appliances installed, and asked him to immediately approve a check so she could lock in prices for the appliances before prices increased at the

end of the year. She showed Ackley an invoice for the project's appliances (but not her own), as well as a spreadsheet documenting the amount of money she said she needed at that time to pay for the project's appliances (but not her own). Relying on her representations, Ackley approved the expenditure of about $25,000 in federal funds and the issuance of a check. McGeshick used that money to pay in full for her own appliances, which were soon delivered to a storage unit owned by her fiancé, and used the remaining funds to pay part of the amount owed for the project's appliances. Several months later McGeshick presented Ackley with a spreadsheet requesting the expenditure of federal funds to cover the balance of the project's appliances; Ackley once again approved the outlay.

After the scheme was discovered, a grand jury charged McGeshick with theft by an employee of an Indian tribal government. *See* 18 U.S.C. § 666(a)(1)(A). She was convicted after a two-day bench trial.

At sentencing the district court determined that McGeshick held a position of public trust and accordingly applied, over her objection, a two-point upward adjustment to her offense level under the sentencing guidelines. *See* U.S.S.G. § 3B1.3. The court found that "Ackley and other people within the [tribal] government relied upon her, trusted her" and that McGeshick had the discretion and authority to make decisions about which appliances the tribe would purchase, and what price to pay for them. The court reasoned that McGeshick's position could not be fairly "compared to either a bank teller or hotel clerk." The court also substantiated the upward adjustment by noting that, after her illicit purchases were discovered, McGeshick had doctored invoices to suggest that Ackley had approved her personal purchases (this fact also supported a two-level increase for obstruction of justice, which McGeshick did not object to). The court sentenced McGeshick to 15 months, the bottom of the calculated guidelines range (15–21 months). If the court had not applied the upward adjustment for abuse of trust, the range would have been 10–16 months.

On appeal McGeshick argues that the district court clearly erred in concluding that she held a position of trust. *See* U.S.S.G. § 3B1.3. McGeshick contends that her job provided her no discretion or decision-making authority, that she simply performed administrative tasks as a "mere assistant" to Ackley, that she had no authority to spend federal funds, and that she therefore did not hold a position of trust within the meaning of the guideline.

Under the guidelines, a two-level upward adjustment is appropriate if the defendant abused a position of public trust. U.S.S.G. § 3B1.3. A position of trust "is characterized by professional or managerial discretion" and an employee who holds such a position is "subject to significantly less supervision than employees whose responsibilities are

primarily non-discretionary," such as a bank teller or hotel clerk. *Id.* cmt. n.1. Although the § 3B1.3 analysis takes into account the amount of discretion given to the defendant and the defendant's authority over valuable things, the ultimate question is whether the victim placed "more than the ordinary degree of reliance on [her] integrity and honesty." *United States v. Bradshaw*, 670 F.3d 768, 770 (7th Cir. 2012) (quoting *United States v. Fuchs*, 635 F.3d 929, 935 (7th Cir. 2011)); *see also United States v. Williams*, 527 F.3d 1235, 1250–51 (11th Cir. 2008). We review the district court's finding that McGeshick abused a position of public trust for clear error. *See Bradshaw*, 670 F.3d at 770–71; *United States v. Deal*, 147 F.3d 562, 564 (7th Cir. 1998) (because abuse-of-trust cases involve "matters of degree, . . . a good deal of latitude must be allowed the trier of fact").

The record does not support McGeshick's cramped vision of her responsibilities as a community planner. The tribe entrusted McGeshick with substantial professional discretion, both in general, and with respect to the appliance-acquisition assignment. The grant application envisioned that McGeshick would play an important role: in the section entitled "Managerial and Technical Staff," the application mentioned McGeshick's years of experience and touted her ability to conduct "project oversight." McGeshick then worked together with Ackley to administer the project, and though Ackley had ultimate authority over the project's finances, he routinely granted McGeshick's requests for funding—supported by spreadsheets McGeshick prepared documenting in general terms who needed to be paid what. This workflow strongly suggests that McGeshick held significant professional discretion, and that Ackley (and, by extension, the government) trusted her to honestly and accurately submit funding requests. *See* U.S.S.G. § 3B1.3 cmt. n.1; *Bradshaw*, 670 F.3d at 770. The activity that led to McGeshick's conviction—obtaining appliances for the project's 11 homes—illustrates McGeshick's level of responsibility. McGeshick maintains that Ackley came to her with a specific, "ministerial" task to obtain price quotes for appliances, but McGeshick's responsibilities went well beyond comparing prices of refrigerator models. Ackley had no involvement in choosing the appliances besides discussing with McGeshick a few general attributes of the appliances. Without any further input from Ackley, McGeshick shopped for the appliances, selected them, asked for early payment to supposedly "lock in" low prices, and requested specific amounts of federal funds to pay for them.

Like previous defendants trusted with substantial professional discretion despite a non-supervisory job title, McGeshick fits "within the class of discretionary decisionmakers covered by the guideline." *United States v. Tiojanco*, 286 F.3d 1019, 1019, 1021–22 (7th Cir. 2002) (accounts receivable clerk); *see also United States v. Bradshaw*, 670 F.3d 768, 769–71 (7th Cir. 2012) (executive assistant and office manager); *United States v. Cruz*, 317 F.3d 763, 767 (7th Cir. 2003) (office manager); *United States v. Hernandez*, 231 F.3d 1087, 1089–90 (7th Cir. 2000) (staff accountant); *United States v. Arreola*, 548 F.3d 1340, 1345–48 (10th Cir. 2008)

(buyer). Without micromanaging her, Ackley allowed McGeshick to play an important role in administering the project and to take ownership of the project's appliance acquisition, suggesting that he believed McGeshick would perform competently and honestly, and exercise her discretion in a manner beneficial to the tribe. *See Tiojanco*, 286 F.3d at 1021.

In arguing that she did not hold a position of trust, McGeshick focuses on her lack of unfettered access to or authority over federal funds, but prudently stops short of arguing that this fact alone is dispositive, a view we have rejected. *See United States v. Fuchs*, 635 F.3d 929, 934 (7th Cir. 2011). Trust—not direct access to valuables—is the touchstone of the § 3B1.3 inquiry. S*ee Bradshaw*, 670 F.3d at 770. The record here supports the conclusion that Ackley trusted McGeshick to provide accurate, legitimate requests for funding, which enabled McGeshick to conceal her personal expenditures within spreadsheets documenting project-related costs. Although McGeshick did not have the ability to authorize the expenditure of federal funds or issue checks without Ackley's approval, Ackley routinely approved her requests, including for the two appliance-related checks. This situation resembles previous cases in which defendants who could not authorize expenditures on their own were still able to steal from their employer because they had earned the trust of individuals who *did* have power to spend money and did not carefully review their requests for outlays. *See Cruz*, 317 F.3d at 767; *Hernandez*, 231 F.3d at 1089–91; *United States v. Deal*, 147 F.3d 562, 563–64 (7th Cir. 1998); *United States v. Emerson*, 128 F.3d 557, 562–63 (7th Cir. 1997); *United States v. Sicher*, 576 F.3d 64, 67–68, 71–74 (1st Cir. 2009).

Even if she had substantial *de facto* discretion to spend federal funds, McGeshick argues, this only supports the view that Ackley incompetently supervised her, rather than suggesting that he trusted her to perform her job honestly. *See Fuchs*, 635 F.3d at 935. Although it is true that Ackley did not oversee McGeshick's work closely enough to discover her crime, the relevant question is *why*: Was he abdicating his job responsibilities or did he rely on McGeshick to perform her duties with integrity? *See Fuchs*, 635 F.3d at 935; *Hernandez*, 231 F.3d at 1091 n.2. The district court endorsed the latter view, concluding that McGeshick was able to commit the crime because Ackley "relied upon her, trusted her." The record supports the court's conclusion: From the very beginning of the project, McGeshick was expected to, and did, have considerable autonomy to perform discretionary functions, and in light of her important responsibilities, Ackley trusted her to request funding only for legitimate purposes. But McGeshick avoided detection by burying her personal purchases within legitimate requests to fund aspects of the project she was responsible for.

Finally, McGeshick challenges the district court's reasoning that her doctoring of an invoice after she took a new job suggested that she held a position of trust with the tribe. McGeshick has a good point—it is difficult to see how her doctoring of an invoice

corroborates that she once held a position of trust—but it is inconsequential. Even if her post-employment decision to alter an invoice is not considered, the record supports the conclusion that McGeshick held a position of substantial discretion and was entrusted to request and spend federal funds with limited oversight.

AFFIRMED.